Jeanette B. **SCHNEIDER**, Executrix under the Last Will and Testament of Harry J. Schneider, deceased, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 19255.**

United States District Court
E. D. New York.

Nov. 21, 1960.

As Amended Dec. 30, 1960.

Gustave G. Rosenberg, Lawrence M. Rosenberg, New York City, Gustave G. Rosenberg, New York City, of counsel, for plaintiff.

Cornelius W. Wickersham, Jr., U. S. Atty., Eastern District of New York, Brooklyn, N. Y., James M. Fitzsimons, Asst. U. S. Atty., Brooklyn, N. Y., of counsel, for defendant.

MISHLER, District Judge.

The plaintiff, Jeanette B. Schneider, as Executrix under the Last Will and Testament of Harry J. Schneider, deceased, brought this action against the defendant, United States of America, pursuant to the Federal Tort Claims Act (28 U.S. C.A. §§ 1346, 2671 et seq.) to recover for the wrongful death of her husband.

This case was tried before the Court without a jury.

The complaint states two claims. The first claim is for conscious pain and suffering and for medical services. The second claim is for wrongful death for the benefit of the plaintiff and her daughter, Karen Ann Schneider.

On October 15, 1958, a twin-engine cargo plane described as a C–123 Troop Carrier, owned by the defendant, United States of America, and operated and controlled by the United States Air Force, was in flight near Riverhead, flying at an altitude of about 8,000 feet on I.F.R. (Instrument Flight Rules). The aircraft was in a "race track pattern" near Riverhead and entered that pattern about 8:20 P.M. A "race track pattern" is described as the direction of flight while maintaining a holding position awaiting instructions when flying on I.F.R.

Prior to entering the "race track pattern", the aircraft encountered difficulty in the audio-receiving system while flying over Saybrook from Salem. The aircraft held in the "race track pattern" for 12 or 13 minutes, during which time the pilot attempted to communicate with the control towers at Idlewild Airport and at Riverhead. Instructions were finally received to proceed to Mitchell Air Field Base, Long Island, at approximately 8:30 P.M., at which time the aircraft left the "race track pattern".

While over Brentwood at approximately 8:37 P.M., the right engine of the plane quit. The pilot immediately turned toward a rotating beacon at Zahn's Airport and switched to cross-feed fuel for the purpose of feeding fuel from the left tank to the right engine. Shortly thereafter, the left engine quit and the pilot feathered the engines to extend the glide.[1] During his maneuver and foundering, the pilot suddenly realized that he could not reach Zahn's Airport for an emergency landing. He scanned the lights visible to him from Southern State Parkway and chose to alight on the Parkway knowing that there were automobiles on the Parkway "because all I could see was homes and lights flickering on the ground—no possibility of picking out another spot".[2]

The aircraft skidded along the roadway and went through the underpass at North Lindenhurst in Suffolk County, shearing off both wings and coming to a stop on the other side of the underpass.

At about 8:40 P.M., the time that the aircraft came in contact with the overpass of Southern State Parkway, the decedent Harry J. Schneider, who was lawfully operating a motor vehicle, came in violent collision with the aircraft. He suffered severe injuries which rendered him unconscious. He was removed to South Shore Hospital. He expired at 10:40 P.M. of that day during an emergency operation.

### Complaint

Paragraph "Thirteenth" of plaintiff's second claim, after alleging negligence generally, specifically alleged that defendant was " * * * further negligent in that they created and maintained a dangerous condition by causing, permitting and allowing the said airplane to

---

1. Testimony of Lieut. Moulson, S.M. 193.

2. Testimony of Lieut. Moulson, S.M. 194, lines 19 to 25.

run out of fuel and they were further negligent in that they failed to ascertain, prior to its taking off, the amount of fuel required, with the result that the said airplane ran out of fuel to bring the said airplane to its destination, thus creating such a hazardous condition which resulted in the crash landing of this airplane into the motor vehicle of the said deceased, * * * that they failed to have proper radio equipment for communication purposes and to ascertain the condition of the said airplane prior to the said crash * * * the said instruments in the said airplane were not working properly and they were further negligent in that they failed to make proper inspection of the extent of the fuel or to determine the amount of fuel necessary for the flight, for which this plane was scheduled and they were further negligent in that they failed to ascertain the weather conditions before taking off."

### Plaintiff's Proof

Plaintiff offered proof of the happening of the accident causing the death of the decedent. Plaintiff further offered proof of the specific acts of negligence in the form of Answers to Interrogatories.[3]

On cross-examination of the defendant's witnesses, the plaintiff conducted an extensive probe into the possible causes of the accident. Inquiry was made as to the air worthiness of the aircraft,[4] maintenance of the aircraft, including the failure to repair the right gas gauge and the proper inspection made in "pre-flighting" the aircraft.

### Defendant's Contentions

The defendant in its answer admits operation and control of the aircraft but generally denies the alleged acts of negligence. The defendant argues:

1) That the first cause of action should be dismissed because the plaintiff has not proven any conscious pain, and

2) The second cause of action should be dismissed because the plaintiff has failed to prove the negligence of the defendant by a fair preponderance of the credible testimony;

3) That the plaintiff by alleging specific acts of negligence and offering proof thereof has waived any inference of negligence implicit in the doctrine of res ipsa loquitur.

Defendant submitted proof that the engines cut out or quit because of gas starvation. Defendant submitted proof of pre-flighting the aircraft when it left Dobbins Air Field Base in Georgia for Brentwood Field in Connecticut and again when it left Brentwood Field in Connecticut enroute to Mitchell Air Force Base in Long Island.

As proof of prudently estimating the fuel supply for its trip to Mitchell Air Force Base, the defendant offered Air Force Regulation No. 60–16. Paragraph 41 of the Regulation is entitled "How Much Fuel Reserve Is Required".[5] Based on the Regulation, the fuel reserve required was computed to be equal to 75 minutes of flight time. Since the engines cut-out at 8:37 P.M. (approximately 79 minutes after take-off), the defendant's proof indicated that there

---

3. "Q. When before the plane had crash landed did any member of the crew know whether there was anything wrong with the aircraft? A. The pilots of the aircraft knew prior to take-off from Bradley Field, Connecticut, that the right gas gauge was inoperative. During the flight from Bradley Field to the point of crash, the crew knew that they had some difficulty with the radio equipment aboard the airplane. The crew knew shortly before the crash that the two engines had quit."

4. S.M. pp. 197–199.

5. Defendant's Exhibit D, USAF Regulation 60–16, paragraph 41 subdivision A. "Reciprocating Engine Aircraft. An aircraft cleared IFR will carry enough fuel for sufficient flight time to fly from take-off point to destination, and from the destination to the alternate, if one is required, plus 10 percent. In no case will the fuel reserve required for clearance purposes be less than that needed for 20 minutes' flight or more than that needed for 2 hours' flight at normal cruising."

was the equivalent of 79 minutes of fuel aboard.

Defendant showed that since the aircraft was flying on I.F.R., it was subject to the instructions issued from the various control towers. When the aircraft took off from Bradley Field, it was instructed to hold in the "race track pattern" for approximately 5 minutes. When it was cleared to Hartford, it was there instructed to hold in the Hartford, "race track pattern" for approximately 15 minutes. The aircraft was then instructed to proceed to Salem intersection but received clearance before reaching Salem to proceed to Riverhead via Saybrook. Because of the failure of the audio-receiving equipment while flying over Saybrook, the aircraft held in a "race track pattern" at Riverhead for about 12 or 13 minutes.

. The Doctrine of Res Ipsa Loquitur

The doctrine of res ipsa loquitur is considered a rule of evidence, which permits the trier of the facts to make an inference of negligence where the instrumentality which produced an injury is in the exclusive possession and control of the person charged with negligence, and such person has exclusive knowledge of the care exercised in the control and management of that instrumentality, and where the accident or injury would not ordinarily have occurred without the negligence of the defendant.

The defendant suggests that where a plaintiff pleads and/or proves specific acts of negligence, the very basis of the doctrine and the reason for the inference of negligence ceases to exist. The Court is of the opinion that the doctrine will continue to supply the inference to support the plaintiff's case in such cases. This is inherent in the practical application of the doctrine. The burden of proof remains on the plaintiff. The inference will not be denied simply because the plaintiff seeks to sustain his burden of proof. It may well be that in proving specific acts of negligence, a plaintiff may fully explain the happening of an accident and further show the defendant's exculpability. Proceeding in this manner, a plaintiff cannot be said to have effected a waiver of the inference, but he may in the process sustain the defendant's burden of explanation. In the case at bar, the plaintiff's probing and proof has not explained the cause of this accident.

The principle is well stated in Citrola v. Eastern Air Lines, 2 Cir., 1959, 264 F.2d 815, at page 818:

"The strength or weakness of the inference will, of course, vary with the circumstances. If the plaintiff introduces evidence tending to prove a specific cause of the occurrence, naturally the strength of the possible inference that the occurrence was attributable to an *unknown* act of the defendant diminishes."

To the same effect are: Lobel v. American Airlines, Inc., 2 Cir., 1951, 192 F.2d 217; Whylie v. Craig Hall, Inc., 272 App. Div. 603, 74 N.Y.S.2d 128; Goodheart v. American Airlines, 252 App.Div. 660, 1 N.Y.S.2d 288; Bratt et al. v. Western Air Lines, Inc., 10 Cir., 1948, 169 F.2d 214, 215; Foltis, Inc., v. City of New York, 1941, 287 N.Y. 108, 114, 115, 38 N.E.2d 455, 153 A.L.R. 1122; Furness, Withy & Co. Ltd. v. Carter, 9 Cir., 1960, 281 F.2d 264, 265; Prosser on Torts, Second Edition, Sec. 43, p. 215; Ingersoll v. Liberty Bank of Buffalo, 278 N.Y. 1, at page 7, 14 N.E.2d 828.

### Defendant's Explanation

The duty of going forward with the evidence is the duty of explanation of the cause of the accident cast upon the defendant. The defendant's operation of the aircraft from the time the emergency arose to the time of the accident was not imprudent. Cast adrift in the skies, hurtling toward the ground, it cannot be said that the pilot acted negligently in the operation of the aircraft. The choice he made cannot be judged by the result but rather by all the surrounding circumstances.

What brought about this unfortunate situation? What caused the emergency?

Defendant's testimony tends to show that the engines quit because of gas starvation. From this the defendant infers that the gas supply was exhausted. The defendant shows compliance with the Rules and Regulations concerning requirements for fuel supply in explanation of this failure. Compliance with the Regulations of the United States Air Force will not bar inquiry into all the surrounding circumstances to determine the culpability of the defendant. The fact of failure weighs heavily against the estimate set forth in the formula embodied in the Regulations. Whether the fuel supply was adequate depends on whether the defendant knew or should have known, that circumstances not normally considered in the approximation set forth in the Regulations, were present at the time of take-off from Bradley Field. Approximately 33 minutes of flight were consumed in hold positions awaiting instructions, and the equivalent amount of fuel was consumed; approximately 12 or 13 minutes of the fuel consumed in the various hold positions was due to the failure of the audio-receiving equipment which, in turn, has not been satisfactorily explained.

The proof of compliance with the Regulations, offered by defendant, does not explain the failure to have an adequate fuel supply. In Grand Trunk Railway Co. of Canada v. Ives, 144 U.S. 408, at page 421, 12 S.Ct. 679, at page 684, 36 L.Ed. 485, the Court said:

"* * * Thus in Chicago etc. Railroad Co. v. Perkins, 125 Ill. 127, 17 N.E. 1, it was held that the fact that a statute provides certain precautions will not relieve a railway company from adopting such other measures as public safety and common prudence dictate * * *."

In Prosser on Torts, Second Edition, pages 163, 164, the author states the rule as follows:

"Where the violation of a criminal statute is negligence, it does not follow that compliance with it is always due care. The statutory standard is only a minimum, and does not necessarily preclude a finding that the actor was negligent in failing to take additional precautions. * * * The same is of course true of administrative regulations * * *."

To the same effect, is McGettigan v. New York Central Railway Co., 268 N.Y. 66, 196 N.E. 745, 99 A.L.R. 283, where the Court pointed out the defendant's duty to conform to the general order for installation of a signal was not the limit of its obligation, but that its obligation was to be defined by the classic test of the conduct of a reasonably prudent man under all the circumstances.

The Court is not satisfied that the emergency described was caused by the exhaustion of fuel supply. There exists the probability that the failure to deliver fuel to the engine was caused by a mechanical failure. The defendant has failed to come forward with any proof that would explain the probable causes of the accident. Defendant's failure is more significant in light of the absence of proof as to the condition of the craft after the accident. The only proof of damage to the craft was to the wings of the plane. The defendant has not shown that the gas tanks, fuel lines, the engines or radio equipment were materially damaged. The defendant did not submit proof as to whether or not there was fuel present in the tanks, whether the fuel lines were in proper working order, whether the radio equipment was in proper working order.

The Court finds that this accident and the resultant injury and death was due to some negligent act of commission or omission of the defendant, its agents, servants or employees.

### Damages

At the time of this accident, the decedent was 50 years of age. He left surviving a widow who was 38 years of age and a daughter who was 10 years of age, at the time of the accident. In the year 1956, decedent's income tax return showed his gross wages from Reeves Instrument Corporation to be $8,950.13, and the income tax withheld to be $1,-

245.99, and the wages received by him after taxes to be $7,704.14. In 1957, the deceased's gross earnings were $8,937.77, less income tax withheld of $1,098.52, and net earnings of $7,839.25. Surviving spouse testified that out of these earnings she received not less than $100 per week and varying sums to $125 per week.

According to the National Life Tables of 1949 to 1951, the life expectancy of the decedent was 22.06 years. The life expectancy of the surviving spouse, according to the same tables, was 36.56 years.

Evidence of the physical condition of the decedent showed that the decedent was admitted to South Side Hospital on February 23, 1958, for treatment of a "coronary thrombosis myo cardio infarction" (plaintiff's Exhibit 5). He was discharged on March 16, 1958. Thereafter, and for sometime prior to his death, the decedent was able to perform his usual duties as an audio maintenance engineer.

The Court has taken into consideration normal diminution of earning powers in the latter years of the life span computed. The Court in determining the pecuniary loss to the surviving spouse and child has considered the factors and the formulas for ascertaining pecuniary loss set forth in O'Connor v. United States of America, 2 Cir., 269 F.2d 578.

The Court finds that the plaintiff Jeanette B. Schneider as Executrix of the Estate of Harry J. Schneider, deceased, is entitled to recover of the defendant the sum of $128.50, which represents reimbursement for hospital charges, and the sum of $1,708.40 as reimbursement for funeral expenses. No damages are awarded for conscious pain and suffering on plaintiff's first stated claim.

Plaintiff Jeanette B. Schneider as Executrix of the Estate of Harry J. Schneider, deceased, for her own benefit, is awarded $55,000 as and for fair and just compensation for her pecuniary loss.

Plaintiff Jeanette B. Schneider as Executrix of the Estate of Harry J. Schneider, deceased, for the benefit of the infant daughter of the decedent, Karen Ann Schneider, is awarded the sum of $7,500.

The foregoing constitutes the findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.