**Dennis WRYNN, an infant, by his guardian ad litem, Vincent Wrynn and Vincent Wrynn, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 19284.**

United States District Court
E. D. New York.

Dec. 20, 1961.

Dranitzke & Lechtrecker, Patchogue, N. Y., Charles Kramer, New York City, of counsel, for plaintiffs.

Joseph P. Hoey, U. S. Atty., E. D. New York, Brooklyn, N. Y., Carl Golden, New York City, of counsel, for defendant.

458

DOOLING, District Judge.

The infant plaintiff, Vincent Dennis Wrynn, sues under 28 U.S.C.A. §§ 1346 (b), 1402(b) 2412(a) and 2674 for personal injuries allegedly sustained through defendant's negligent operation of an Air Force helicopter in aid of a State Sheriff's search for an escaped prisoner of the State. His father, Vincent W. Wrynn, sues to recover medical expenses and for the loss of his infant son's services. The United States denies that the helicopter caused Wrynn's injuries, denies that it was negligent, denies that the use of the helicopter was authorized, and alleges that Wrynn was contributorily negligent.

On July 22, 1958 two prisoners escaped from the Suffolk County Penal Farm at Yaphank, New York. Sheriff Charles Dominy of the County of Suffolk and Acting Captain Jacob T. Baczensky of the Brookhaven Town Police instituted a search; by five-thirty in the afternoon of July 23d one prisoner had been apprehended in the wooded South Setauket area. The search for the second prisoner continued in the same area.

The Setauket Volunteer Fire Department had offered, and Sheriff Dominy had requested the Centereach Volunteer Fire Department, to help in the search. The Sheriff used words of request, not of command, in securing men from the two Fire Departments but he was conscious that he had the power to command assistance (New York Judiciary Law, McKinney's Consol.Laws, c. 30, § 400, N.Y. Constitution, Art. IX, § 5, Cf. Isereau v. Stone, 207 Misc. 941, 948–950, 140 N.Y. S.2d 585, 592–594 (Sup.Ct.1955), aff'd in part and rev'd in part on other grounds, 3 A.D.2d 243, 160 N.Y.S.2d 336 (1957)). He did not formally deputize the firemen who joined the search, but informed the heads of the fire departments that their men participating in the search were specially deputized for his assistance.

A little after five-thirty in the afternoon of July 23d, Sheriff Dominy asked the Suffolk County Air Base and the Nike Base at Shoreham for men to join the search party. The Air Force Base responded by dispatching some men and asking Sheriff Dominy whether he wanted a helicopter; the Sheriff said he would "love one" and the Base dispatched a helicopter to the search area.

The pilot in command of the helicopter was Lieutenant Pickering, the co-pilot, Lieutenant (now Captain) Jackomis and the crew chief, Airman Battaini. Both pilots were trained for helicopter service and each had 100 or more air hours in the particular type helicopter used in the search mission. Both pilots were assigned to rescue duty and had participated in rescue operations. Their experience included landing in unprepared areas. Their continuing training at the Air Force Base included making landings in unprepared areas two to three times a month. Both had landed helicopters on public highways in the course of their duties before July 23, 1958.

The general instructions of the Base to Lieutenant Pickering were to report at the disposal of the Sheriff of Suffolk County to aid in the search for the escaped prisoners. Sheriff Dominy, in appealing to the Air Force Base, did not conceive that he was commanding its help in his authority as Sheriff; he did not believe that he could give orders to the military.

The helicopter initially flew search patterns under hand signals given to it from the ground by uniformed policemen. At about six-thirty the helicopter landed at the intersection of Norwood Road and Route 80, a four lane east-west highway in the Setauket area, to establish better contact with the Sheriff's party. Lieutenant Pickering left the helicopter, conferred with representatives of the Sheriff's office and of the Brookhaven Town police to get information and instructions about further prosecuting the search and, without talking to the Base about the propriety of it, arranged at the Sheriff's request to take aboard the helicopter Chief Deputy Sheriff Corso,

Brookhaven Town Police Detective Stanton and a two-way police radio set.[1]

The helicopter took off with its augmented crew of five and traversed two different search areas indicated by the police. While the flight continued the airborne police communicated on the police radio directly with the Sheriff's party on the ground. The helicopter maintained contact with the Suffolk Air Base Tower through its own radio. The Base Tower could communicate with the Riverhead communications center of the Sheriff's office and through it, as a relay point, establish communication between the Sheriff's ground search party and the helicopter crew.

The ground search party moved about while the helicopter was aloft; it changed its command base to the intersection of Route 80 and Horseblock Road in the South Setauket area some time before seven-thirty in the evening.

The infant plaintiff, Wrynn, had learned of the search and, with a companion, went by automobile some time after seven o'clock to the intersection of Route 80 and Horseblock Road while the helicopter was aloft. He asked the Sheriff whether he could join the search party and the Sheriff told him that, at seventeen, he was under age; the Sheriff thought the escaped prisoner was unarmed but could not be certain of that. Wrynn and several companions then drove around the periphery of the search area and back to the intersection of Route 80 and Horseblock Road. Wrynn stayed there, standing on the grass mall dividing Route 80's two pairs of traffic lanes; he stood very near Sheriff Dominy's car, at a point about sixty feet east of the easterly edge of the intersection.

Shortly before eight o'clock in the evening Lieut. Pickering was advised by the Air Force Base that the weather was deteriorating. It was still daylight, visibility and ceiling were still adequate, and there was a light easterly wind; dusk was approaching and further search from the air seemed futile. Lieut. Pickering told Detective Stanton on the interphone that the helicopter should return to its Base in view of the weather and asked Stanton where he and Corso wanted to be set down. Stanton asked that they be set down near the Sheriff's party, if possible, rather than at the Norwood Road intersection, three to four miles distant, at which they had been picked up. Lieut. Pickering assented and prepared to land near the intersection of Route 80 and Horseblock Road.

At the point of prospective landing Route 80 is a four-lane, black-top highway; the pairs of lanes are divided by a grass planted mall 30 feet wide; each pair of lanes is 25 feet 5 inches wide and has 9 foot shoulders; the total width of the highway, including the shoulders, is 98 feet 10 inches. On the Route 80 mall east of the Horseblock Road intersection were two saplings; they were over 402 feet from each other and distant easterly of the east edge of the intersection some 273 feet 6 inches and some 675 feet and 6 inches respectively. The sapling nearer the intersection was offset somewhat from the center of the mall toward the north (westbound) pair of lanes, and the sapling 402 feet farther along eastward was correspondingly offset somewhat from the center of the mall toward the south (eastbound) pair of lanes. The saplings were not more than 20 feet tall.

There were at the time twenty or more people in the intersection area, all near the intersection; they included bystanders not engaged in the search. There were at least five vehicles in addition to the cars of Sheriff Dominy and Acting Captain Baczensky. The two police cars

---

1. At about the same time a detachment of men from the Air Force Base also met with the Sheriff's party at the same crossroads. The detachment was not permitted by its commanding officer to participate in the search as an organized unit when it was learned that the escaped man was not a military prisoner. The detachment was disarmed, dismissed and the men left free to join the search party as individuals. This episode was not shown to have been observed by or reported to Lieut. Pickering.

were parked on the center mall near the eastbound lanes within about sixty feet of the east edge of the intersection; there were two fire engines that were or had been parked on the mall near the police cars. Three private cars were standing east of the intersection, just off the shoulder of the eastbound traffic lanes. The most easterly of these private cars, a brown station wagon, was about 300 feet east of the intersection; the more westerly of the two saplings was another 40 or 50 feet east of the brown station wagon.

Sheriff Dominy and Acting Captain Baczensky, both of whom were at the intersection, were advised of the helicopter's plan to land near the intersection and Lieut. Pickering asked that the area be cleared for landing and traffic stopped. Acting Captain Baczensky went to the intersection and stopped the eastbound traffic at that point. Apparently the westbound traffic was also stopped by a police car block a quarter mile east of the intersection; no vehicles appeared from that direction during the events that followed.

Acting Captain Baczensky had assumed charge of the ground traffic. He did not instruct the vehicles standing along the roadside to leave the area or to remain immobile until the helicopter landed. No order was given to clear the area of bystanders.

The helicopter pilots were advised from the ground that traffic had been halted but they were not told and did not ask whether the standing vehicles had been immobilized or ordered to leave.

The helicopter made several passes over the area, preparatory to landing and on one pass the pilots observed, or thought they observed, uniformed police directing them to land southeast of the intersection and clear of the traffic lanes; they gestured rejection of this spot to the police; they considered that its slope, the presence of trees and the absence of an exit path made it impracticable. They also eliminated a field northwest of the intersection from consideration as a landing place because numerous cars were parked there. The pilots concluded that the appropriate landing place was a point on the center mall midway between the saplings. The ground party was informed of the landing plan.

The helicopter on its landing approach came from southwest of the intersection at a flat angle to the road on an easterly path of flight directed toward the chosen landing spot. The helicopter, under Lieut. Jackomis' control, started its steep descent and flared the approach, to stop the descent, bearing leftward. It was moving forward at 7 to 10 knots, was 35 feet in the air over the eastbound lane of Route 80 and had passed a point opposite the easterly sapling when the brown station wagon, the most easterly of the cars standing off the eastbound lanes, started into the traffic lane directly under the helicopter's flight path. It moved easterly at starting-up speed and veered toward the center mall. Lieut. Pickering and Lieut. Jackomis saw the brown object move forward below and from rearward of the helicopter and along the helicopter's path of flight. The helicopter was already committed to landing and was soon within ten feet of the ground. Had the helicopter then sought to rise vertically, its tail would have dropped and raked the ground or possibly, in the pilot's view, have struck the brown station wagon. Lieut. Jackomis banked right as the brown station wagon veered toward the center mall, and, with the helicopter still in forward motion, swung it right. As the helicopter was within two feet of the ground a jar was felt; the helicopter put down on the eastbound lane just opposite the easterly sapling. The rotor ends had struck the easterly sapling, knocking off the streamlined airfoil covers of the balance boxes at each rotor blade tip and tearing off an upright branch of the sapling.

The brown station wagon drove on to the center mall, stopped briefly, then drove round the sapling and helicopter back to the eastbound lane and disappeared eastward. Neither it nor its driver have been located.

Wrynn was standing close to Sheriff Dominy's car while the helicopter landed; he was over 600 feet from the easterly sapling. Wrynn's companion called out that the helicopter had hit the tree and, as Wrynn looked toward the helicopter, he saw its blades strike the sapling, saw wood fly from the contact and felt a blow on his left leg. He looked down, saw his trouser leg ripped open and a wound on the innnerside of his left knee. He called for help; he was made to lie down, covered with a blanket or heavy coat, a tourniquet was applied to this thigh and he was given a cigarette. He did not lose consciousness.

Three other persons were felled simultaneously with Wrynn. Both Sheriff Dominy, who was nearest Wrynn, and Acting Captain Baczensky heard the whirr of flying objects going past them almost simultaneously with the sound of the rotor tips' striking the sapling. No one called as a witness saw a piece either of the sapling or of the helicopter strike Wrynn. What struck Wrynn was neither found nor directly identified. Fragments of bark and wood were, however, found in the wound on Wrynn's leg.

There was no evidence of any other contemporaneous violent event in the area. How the collision between the rotor tips and the sapling dealt the blow to Wrynn's leg is pure speculation. Nevertheless the inference that the collision was the direct physical cause of the blow to Wrynn's leg inescapably arises from the coexistence of the impact and only one uncontrolled source of force apparently adequate to produce the impact. Much is unexplained that would require explanation if any other possible cause for Wrynn's injury appeared. For example, the medical witness called by plaintiff questioned whether a fragment of a tree branch could travel 600 feet and retain the combination of weight and speed required to effect the massive avulsion of flesh he found in Wrynn's wound; he accordingly speculated that metal must have accompanied the wood. Such doubts and speculations demonstrate the uncertainty of the means of

the blow; they do not create any uncertainty about its source.

Plaintiff contends that the pilots were negligent in selecting a landing place the risks of which were obvious; in rejecting a tried and convenient alternative landing place; and in mismanaging the helicopter by failing to lift it vertically, instead of maneuvering in continuing descent, when the brown station wagon moved into the descending helicopter's path of flight.

Defendant contends on the other hand that there was no negligence in the choice of landing place, given the specialized experience of the pilots and the specialized mission of the helicopter, or in managing the helicopter's landing. Defendant argues, too, that since the movement of the brown station wagon created an emergency, the pilots were not at fault even if, having alternative courses to choose among, they chose an alternative that would not have represented the choice of prudence in the absence of an emergency. See Rowlands v. Parks, 1956, 2 N.Y.2d 64, 156 N.Y.S.2d 834, 138 N.E.2d 217.

Voluntarily landing a helicopter on a travelled highway might well, in ordinary circumstances, constitute negligence. The negligence, however, would lie in the voluntary disregard of probable traffic. Cf. Schneider v. United States, 1960, E.D.N.Y., 188 F.Supp. 911, 914. The landing area here chosen was not in use as a public highway at the time of landing. It was then a place under positive police control.

The risk that a vehicle observably standing in the area would start into motion and render landing unsafe was not manifest; vehicular movement into rather than within the alerted area was the foreseeable risk. But, assuming that the risk was real, the pilots initiated an adequate precaution to control that hazard when they requested the police to have the area cleared for landing and the traffic stopped. The police action, indeed, proved inadequate to immobilize the parked vehicles and the police may

have advised the pilots only that they had stopped the eastbound traffic at the intersection.[2] If so, in retrospect, that advice now seems to have left open the negative implication that the brown station wagon might not have been brought under effective police control. If the pilots had drawn the inference of inadequacy in traffic control, proceeding to land would have been negligent for they did not in fact ask whether the vehicles parked east of the intersection had been immobilized. But the pilots did not so react, either missing the implication of ground report or failing to recognize as real the risk that a standing vehicle, already east of the intersection might start into motion. To characterize either alternative of the pilot's conduct as actionable negligence requires a refinement of inference not warranted by the uncertainties of the evidence and foreign to the dominant significance of the events. The just inference from the events is that the pilots either reasonably supposed that the standing vehicles were already under control before the traffic was stopped at the intersection or equally reasonably supposed that the report that traffic had been stopped at the intersection implied that no more was necessary to prevent traffic movement or, much more simply, reasonably found in the sequence of observation and report no disclosure of a risk that the standing vehicles would start into motion. In the total circumstances that is not found to have been an observable risk of the landing. See Williams v. State, 1955, 308 N.Y. 548, 554, 127 N.E.2d 545.

No negligence existed in the choice as a landing place of the Horseblock Road intersection over the conveniently near Norwood Road intersection that had been successfully used for a landing and take-off earlier in the evening. The safety of the Norwood Road site would also have depended on positive police control of the area; the safe landing and take-off there produce a specious appearance of greater safety because, adventitiously, there was no interfering incident there to test the adequacy of the police controls of the site; potentially, ground interference was no less probable there than at Horseblock Road, for both were equally accessible to the public.

The alternative of returning to Suffolk County Air Force Base and its presumably ideal safety controls would have involved delay in returning the Chief Deputy Sheriff and Town Detective to the search party of which they were a part. Avoiding that delay, while not unimportant, would not have justified creating a significant risk of serious bodily injury. But the landing place and procedure chosen involved no specific intrinsic risk of that sort. The risk arose not out of the choice of a landing place and procedure but out of the actual inefficacy of the control of ground conditions; such a failure was not so foreseeably a risk of landing at Horseblock Road as to require choice of the alternative of returning to the Base where any risk of that class was presumably less likely to exist.

Whether the pilots could have managed the helicopter differently and averted all damage is at best controversial. The various estimates of the height of the helicopter in its steep descent are not in good agreement. Both Wrynn and Acting Captain Baczensky were watching the helicopter descend and thought it was 40 or 50 feet high as it came in to land. Baczensky reported without comment that Lieutenant Pickering had told him immediately after the accident that the brown station wagon started up and pulled out and crossed the lane into the mall as he was "about to land" the helicopter and that his maneuvering to the

---

2. There is evidence that the pilots were informed or observed that the westbound traffic had also been stopped. Since westbound traffic was not a factor in the accident, the uncertainty as to its stop- page and the pilots' knowledge of that bears only on whether the report on traffic control was sufficiently complete for the pilots to rely upon it.

right to clear the car was unsuccessful because of the weight of the helicopter and because it was "already too low".

Lieut. Pickering's deposition indicates that when he first saw the brown station wagon the helicopter was 35 feet above ground and that it traveled another 125 or 130 feet before it landed. At the speeds given for the helicopter's forward movement (and assuming no deceleration) that would have taken from about seven to about ten seconds. It was Pickering's judgment that to have attempted a direct ascent, reversing the steep descent, at any altitude between 10 feet and 250 feet would have involved extreme danger and the special complications arising out of the fact that the tail of the helicopter would have to drop to execute the maneuver.

Sheriff Dominy, observing the event from approximately the same position as Wrynn, remembered that the brown station wagon started up as the helicopter was about to touch ground; to him the helicopter seemed to try to lift up and then sagged leftward. His next recollection is of things whizzing through the air and several people dropping to the ground, although he saw nothing actually hit any of the persons who fell. He thought the brown station wagon traveled 50 to 100 feet, pulling into the east lane first, then veering north toward the mall and then straightening out and going eastward. He would have placed the helicopter some 15 or 20 feet above the car when their relative paths of travel first coincided.

Lieut. Jackomis, who was flying the helicopter, was not asked to estimate the altitude of the helicopter at the moment the brown station wagon was sighted nor to describe the details of the landing. He did not believe that there was any feasible alternative to the maneuver executed. He pointed out that the landing was, in its broad terms, successful. It avoided collision with the brown car, averted all injury to the five men on the helicopter, (whose safety was directly in hazard), and, at minimum, held damage to person and property in the landing

area to a very low level in terms of the implicit potentials of aircraft disaster damage.

On this evidence negligence in the management of the helicopter from the time when the brown station wagon started to move until the moment of landing does not appear as a matter of law and is not shown by a fair preponderance of the evidence. While the evidence does not compel a conclusion of freedom from fault it substantially outweighs the contrary evidence in total persuasiveness.

■■ The helicopter and its personnel had not as defendant contends, been so clearly placed under the direction of the local law enforcement authorities that any negligence of the pilots should be attributed to the Sheriff or the town rather than to the defendant. The evidence of transfer and assumption of control does not go that far. Ramsey v. New York Central R. R., 1935, 269 N.Y. 219, 224, 199 N.E. 65, 102 A.L.R. 511; Lawless v. Board of Education, 3d Dept. 1958, 6 A.D.2d 655, 657, 180 N.Y.S.2d 220; Naitove & Co. v. Davis, 1st Dept. 1948, 273 App.Div. 368, 370, 77 N.Y.S.2d 330. Compare Sanchez v. United States, 10th Cir.1949, 177 F.2d 452. Similarly, the contention that Wrynn was contributorily negligent in staying at the scene while the helicopter landed is not borne out by the evidence. Wrynn was 500 feet from the projected landing area; the twenty others present, none of whom left when the landing was in prospect, may be thought to establish by a fair enough statistical sample the reasonable prudence of remaining; the highest police authorities of the area were present and they had not directed anyone to leave.

The provisions of 18 U.S.C.A. § 1385 would appear to preclude any recovery against the United States in any event. The section provides:

"Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute

the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both."

Enacted in 1878 as Section 15 of the Army Appropriation Act for the fiscal year 1878–1879, the section in its original form made employment of any part of the Army for the forbidden purpose unlawful, forbade use of any funds appropriated by the Act to defray the expense of the forbidden uses, and made wilful violation a misdemeanor, punishable by a fine up to $10,000, or imprisonment for not more than two years, or both (20 Stat. 145, 152). When Congress codified Title 10 ("Armed Forces") of the Code in 1956, it repealed Section 15 of the 1878 Act (70A Stat. 646, § 53) and by Section 18(a) of the codifying Act of 1956 added § 1385 in its present terms to Title 18 (70A Stat. 626). Section 49(a) of the codifying Act stated that the legislative purpose was to restate without substantive change the law replaced by the first 48 sections of the codifying Act; (70A Stat. 640); Section 18(a), strictly, did extend the law to include the Air Force, but Congress cannot be thought to have altered the principle of the statute.

■ The legislative history leaves little doubt that the statute is indeed meant "to preclude the Army [or Air Force] from assisting local law enforcement officers in carrying out their duties" (Gillars v. United States, 1950, 87 U.S. App.D.C. 16, 182 F.2d 962, 972. Compare Chandler v. United States, 1st Cir., 1949, 171 F.2d 921, 936). The view had been taken by Attorney General Caleb Cushing in 1854 that under Section 27 of the Judiciary Act of 1789, United States Marshals, like Sheriffs, could raise a posse comitatus comprising every person in the district above fifteen years of age "whatever may be their occupation, whether civilian or not * * * including the military of all denominations, militia, soldiers, marines, all of whom are alike bound to obey the commands of a Sheriff or Marshal." 1854, 6 Op.A.G. 466, 471, 473. As Cushing saw it, "The fact that they are organized as military

bodies, under the immediate command of their own officers, does not in any wise affect their legal character. They are still the posse comitatus." 6 Op.A.G. 466, 473. Attorney General Charles Devens in 1878 took the same view of the law as it had been before the passage, earlier in the same year, of Section 15 of the 1878 Act, and he stated that the practice had been to permit the military to be used in subordination to the marshals when such aid was needed to enforce process and he considered the practice to be sanctioned both by custom and by opinions of earlier Attorneys General. (1878, 16 Op.A.G. 162, 163).

When Section 15 was debated in the Senate the validity of Cushing's opinion was questioned by Senator Sargent (7 Cong.Rec. 4247). Mr. Knott, who introduced the Section as an amendment to the Appropriation Bill, assumed only the existence and not the legitimacy of the practice (7 Cong.Rec. 3849) and argued the importance of stopping such uses of the military, under adequate punitive sanctions except where the Congress had expressly authorized the use (7 Cong. Rec. 3846–3847). He envisaged the penalty he proposed as applying to everyone, from the Commander in Chief to the lowest officer, who presumed to take upon himself to decide when he would use the military force in violation of the law of the land (7 Cong.Rec. 3847, 3851) and visualized the statute as forbidding every employment of the Army or any part of it in aid of civil law enforcement unless under explicit statutory authorization (7 Cong.Rec. 3849). See, e. g. 10 U.S.C.A. § 331–334 (Presidential powers). The Senate amended the bill by adding the reference to express Constitutional authorization and by deleting so much of the House Bill's language as referred to use of the military "under the pretext" of executing the laws (7 Cong.Rec. 4240). The Senate debate indicated a sense that the section was not limited by the expression "as a posse comitatus or otherwise" but was to operate as if the prohibition ran—simpliciter—against the use of the Army to execute the laws, without ref-

erence to whether employed as a posse comitatus or as a portion of the Army (7 Cong.Rec. 4241, 4245).

The statute is not an anachronistic relic of an historical period the experience of which is irrelevant to the present. It is not improper to regard it, as it is said to have been regarded in 1878 by the Democrats who sponsored it, as expressing "the inherited antipathy of the American to the use of troops for civil purposes." (Sparks, National Development 1877–1885, p. 127, in Vol. 23, The American Nation, A History.) Its relevancy to this age is sadly clear (1957, 41 Op.A.G. No. 67). The innocence and harmlessness of the particular use of the Air Force in the present case, the dissimilarity of that use to the uses that occasioned the enactment, these considerations are irrelevant to the operation of a statute that is absolute in its command and explicit in its exceptions.

Given the statute and its continuing vitality, the use of the helicopter and its personnel here to aid in executing the laws of New York was a forbidden use. It could not have been authorized on behalf of the United States by any action short of a Congressional enactment. There could be no Air Force undertaking or enterprise in the premises to which its personnel or equipment could be lawfully assigned and, in consequence, the absence of any defect in formal orders, the absence of any element of self interest on the part of the officers and the presence of an obvious public safety objective are irrelevant. They cannot bring the case within the narrow area in which agents of the government can be found to be acting within the scope of their employment although beyond their actual authority (Hatahley v. United States, 1956, 351 U.S. 173, 180–181, 76 S.Ct. 745, 100 L.Ed. 1065) because there was here no activity that could be authorized, no legally cognizable "scope of employment" to which the questioned conduct could be related. Cf. United States v. Alexander, 4 Cir.1956, 234 F.2d 861, 865; Sanchez v. United States, 10th Cir.1949, 177 F.2d 452; Ford v. Grand Union Company, 1935, 268 N.Y. 243, 246, 253, 197 N.E. 266; Burmaster v. State, 1959, 7 N.Y.2d 65, 68, 70, 195 N.Y.S.2d 385, 163 N.E.2d 742; Restatement, Agency Second, Sec. 229(e).

It is, therefore, concluded that plaintiffs have not established that the injury to the infant plaintiff was incurred through the negligence of defendant's officers and that plaintiffs have not established that the infant plaintiff's personal injuries were caused by the act or omission of any employee of the Government while acting within the scope of his office or employment.

The foregoing constitute the findings of fact and conclusions of law herein.

Enter judgment accordingly dismissing the complaint.