*238 OPINION OF THE COURT
Jeremiah J. Moriarty, J.
Claimant seeks damages from the State of New York for the destruction of its helicopter when it crashed into the upper Niagara River in a celebrated and well-publicized attempted rescue of people stranded in the rapids just above Niagara Falls. The claim was timely filed and has not been assigned.
On the afternoon of October. 7, 1973, three adults and an 18-month-old baby were riding in a pleasure boat on the upper Niagara River. Apparently unaware of the danger presented by the rapids which immediately precede Niagara Falls, the party ventured into the swift, shallow water where the engine propeller hit a rock and the boat lost power. Unable to restart the motor, the people in the boat, including the 18-month-old infant, had no choice but to abandon ship, and hope that help would arrive to extricate them from their perilous position. The boat, lacking power or direction, proceeded downstream and over Niagara Falls.
At 3:32 that afternoon, Edwin Wright, a police officer employed by the Niagara Frontier State Park and Recreation Commission, was working as a radio dispatch operator at the main station at Prospect Point when he received a call that there was a boat in trouble off the east end of Goat Island. He relayed this information by radio to Officer James R. McNeil who proceeded immediately to the scene where he arrived in time to see the boat swept over the falls. Officer McNeil observed people standing in the rapids; a man and woman about 400 feet off shore, and a man holding a baby 300 feet further upstream. With the aid of Officers Lysle Newberry and Joseph Boyd, also of the Niagara Frontier State Park and Recreation Commission, and with a rope secured around his waist, McNeil tried to wade out to the man and the child but he was turned back by the swift current.
Thereafter, the three officers proceeded to the heliport on Goat Island to obtain the aid of a pilot and helicopter. At the time, the heliport was operated by Prior Aviation Service, Inc., the claimant herein, pursuant to an agreement with the Niagara Frontier State Park and Recreation Commission. On numerous previous occasions the helicopters and pilots of Prior Aviation had been enlisted by the park police to effect rescues. Such a procedure was not out of the ordinary, and there was a spirit of voluntary co-operation between claimant and the police. Dale Hartman, a licensed helicopter pilot with *239 considerable flight experience and a part-time employee of claimant’s, had just landed after a refueling stop at the Niagara Falls Airport. He was flying a 1961 Bell Ranger Model 47J2, FAA License No. N-8453E, which was owned by claimant.
On his return to the Goat Island heliport, Mr. Hartman noticed the people in the water and, when he landed, he was approached by the officers. They told him of the people stranded in the water and enlisted his aid in a rescue attempt. They indicated that they wanted to first rescue the baby. Mr. Hartman, in the spirit of co-operation previously referred to which existed between cliamant, its employees and park police, agreed to assist. The right door of the helicopter was removed and Hartman, with McNeil and Boyd as passengers, took off. There was no rescue equipment in the helicopter, nor was there any conversation between the officers and the pilot regarding the capacity or in-flight limitations of the helicopter.
Hartman made one pass over the man and the child and, on the second approach, he hovered at an altitude of two to three feet above the river. With the helicopter at a 45-degree angle forward to keep it into the wind, he flew towards the people in the water. At the same time McNeil, supported by Boyd, leaned out the right side of the 'copter and motioned to the man to hand up the baby. The man did so and McNeil took the child. The helicopter began to lift off, but the man remaining in the water took hold of the right strut. This caused the helicopter, which has a delicate center of gravity, to tip forward and to the right. The overhead propeller struck the water or a submerged rock and the entire helicopter crashed to the river below, landing some 40 feet downstream of the stranded man. Officer Wright, the radio dispatch operator, testified that at 3:43 p.m., he received a call that the helicopter was down. It thus appears that from the time the Niagara Frontier State Park Police were informed, at 3:32 p.m., that people were stranded in the river, to the helicopter’s use in the attempted rescue and its crash to the river below, 11 minutes had elapsed. The helicopter was a total loss.
Upon impact, the helicopter’s gasoline supply exploded and the flaming gas drifted downstream and over the falls. Luckily, any injuries suffered in the crash were minor. All in the water, Hartman, Officers McNeil and Boyd as well as the three adults and baby from the pleasure craft mishap, made *240 their way to the helicopter’s wreckage where they awaited rescue.
During the next approximately two and one-half hours, other rescue attempts were made. Officers of the Niagara Frontier State Park Police attempted to guide a launch to the stricken people in the river but it met the same fate as the other craft. It lost power and the officers abandoned ship before the launch was swept over the falls. Ultimately, a line was shot from Goat Island to the people stranded at the helicopter wreckage. The line was secured to the top of the 'copter and, with its aid, all the stranded people worked their way to shore and the rescue of those in danger was finally and successfully effected.
Claimant advances two theories in support of its claim for damages for its lost helicoper against the State: common-law negligence and statutory liability.
COMMON-LAW NEGLIGENCE
Claimant’s primary contention is that the State’s negligence in the attempted rescue is manifested by the fact that the State went ahead with the rescue, and made use of the helicopter without any knowledge of the limitations of the helicopter and the foreseeable consequences that would result from the actions. It must be remembered, though, that in evaluating the actions of the State, an emergency situation was apparent and the response thereto must be judged in accordance with the well-recognized "rescue doctrine”.
The rescue doctrine is, in the usual case, invoked in an action by the injured rescuer against the party who instigated the peril (be he the party in danger or a third party who created the dangerous situation). In such a case, the defendant, if he negligently caused the danger, is liable to the plaintiff rescuer for any injuries incurred in effectuating the rescue, provided the acts of the rescuer were not rash or wanton or reckless but, rather, are reasonable in view of the emergency situation confronted. As Judge Cardozo stated in Wagner v International Ry. Co. (232 NY 176, 182): "The plaintiff had to choose at once, in agitation and with imperfect knowledge. * * * Rescue could not charge the company with liability if rescue was condemned by reason. 'Errors of judgment,’ however, would not count against him, if they resulted 'from the excitement and confusion of the moment’ (Corbin v. Philadelphia, 195 Penn. St. 461, 472). The reason that was *241 exacted of him was not the reason of the morrow. It was reason fitted and proportioned to the time and the event.”.
In appropriate cases, the emergency doctrine is equally applicable to evaluate the conduct of a defendant. For example, in Meistinsky v City of New York (128 NYS2d 483, revd on other grounds 285 App Div 1153, affd 309 NY 998), cited by the State, the negligence of the defendant’s police officer was alleged as a basis for recovery for the death of the plaintiffs decedent. The officer happened upon an armed holdup in progress and, in his attempt to prevent the robbery and apprehend the wrongdoers, the officer engaged in a shootout as a result of which claimant’s decedent, an innocent bystander, was killed. In finding the officer’s actions to be free from negligence, the court said: "When a person acting in an emergency not of his own making, seeks to save human life and in the course thereof another is injured, no actionable negligence exists.” (Meistinsky v City of New York supra, p 487; see, also, Restatement, Torts 2d, § 296 and the Comments thereto; 65A CJS, Negligence, § 123, pp 77-83.)
Here, where both parties to the action approached the court as rescuers, the conduct of each must be evaluated with due regard for the rescue doctrine if, in fact, an emergency existed. Claimant contends that emergency was not imminent and rescue not immediately necessary. It is contended that time for reflection was available, and acts taken in haste, which resulted in serious omission and the ultimate damage herein, were irresponsible and culpable. It is correctly argued that the question of the existence of immediate peril, and the evaluation of the response of the actors, is a question within the province of the trier of fact.
A review of the facts reveals the presence of a clear emergency, and imminent danger to the former occupants of the pleasure boat who were stranded in the rapids of the upper Niagara River just upstream of the Horseshoe Falls. The current was swift and the footing for the stranded people was invisible to those on shore. The strength of the people in the river and their ability to withstand the force of the current was an unknown factor. The question of how long these people could maintain their positions and avoid imminent death only yards away, while the rescuers engaged in careful deliberation, was one obviously resolved by rescuers in favor of immediate action. They acted on the probability that there was little time for reflection and the necessity of immediate life *242 saving measures was paramount. It is clear that an emergency did exist, that lives were in immediate peril, and that the actions taken by the rescuers, the State and the claimant, were done under the strain of the moment without the luxury of reflection.
Not any action taken as such is shielded from culpability. Rather, as noted, such actions must be reasonable in all the circumstances; they cannot be reckless, wanton or rash. Here, claimant argues that such gross errors of judgment were committed by the State that they should be charged with negligence in effectuating the rescue, the result of which was loss to claimant. In this regard, the testimony of Jack Prior, president of claimant corporation, must be reviewed. He related in understandable, lay terms, the limitations inherent in the operation of the helicopter in question, and the dangers attendant upon water-to-air rescue. He explained that the center of gravity is short and, as a result, sudden forces, such as occurred herein when the strut of the craft was seized by the man in the water, would have the effect of destabilizing the craft, which is precisely what happened. He noted that the proper way to make a water-to-air rescue is with a winch and line so that the victim can swing free in the air when released from the force of the current. In that way, the effect of the force on the helicopter is minimized. He also testified that ground-to-air communication between the pilot and victim is crucial in such situations. Where the craft is close to the water surface and hovers over people, the margin for error is slight. Communication enables the pilot to have advance warning of actions of the victim so that he can compensate for them, and thus maintain the stability of the helicopter.
The helicopter here involved was not equipped with a winch and rope setup. Although rope and harness were available, it does not appear that a winch was. The nearest was at the United States Air Force Base in Niagara Falls where larger helicopters so equipped were stationed. The decision not to await the arrival of such equipment, or the failure to consider such an alternative, does not in this court’s opinion, amount to negligence in view of the necessity of immediate action and the confusion of the moment.
It appears from the record that there was available a bullhorn which, if brought aboard the helicopter, would have enabled communication with the victim during the rescue attempt, and may have avoided the serious consequences *243 which ultimately occurred. Such a horn was not procured. Rather, with a not unreasonable sense of urgency, the two park police officers boarded the helicopter and they and the pilot, Dale Hartman, flew to the man and child in the river. It was the officers’ intention to retrieve the child, fly it to safety, and return with a rope to aid the remainder of the stranded party. The pilot testified that the officers told him, "We will try to save the baby first.” It thus appears that he was aware of the officers’ plans to effecutate the rescue, and the pilot’s acts were not inconsistent with such a plan. It was never their intention to bring the man aboard the helicopter. The pilot hovered over the area until the child was successfully retrieved, and then he started to ascend for the trip to shore. It was apparently at this point, according to on-shore witnesses, that the man in the water seized the right strut of the helicopter causing it to tip to the right and crash to the river below.
There is little doubt that if air-to-water communication had been established prior to instigating the attempt to rescue the child, the danger that the foregoing disastrous events would have occurred might have been substantially reduced. The claimant would have the court assign responsibility to the State for the ensuing damage for this, and other, omissions. In this court’s opinion, such omissions, in view of all the circumstances, do not provide a basis upon which liability can be assessed. It must be pointed out that the failure to have the sound equipment aboard the helicopter, or to get it prior to attempted rescue can be assessed to the officers and the pilot equally. The record shows that all were cognizant of their plan of action.
It is true that the police officers knew little of the limitations of the helicopter, and the consequent hazards of their mission, and that the pilot was conversant with all the risks and proceeded in the face of them. Such disparity of knowledge can hardly be interpreted to cast more, let alone sole, responsibility upon the State for the ensuing mishap. The employees of both parties were acting together, essentially as volunteers. The duty which ran from one to the other was to carry out the joint enterprise with a reasonable degree of care in view of all the circumstances. If no emergency existed, and there was ample time to reflect upon a course of action, we might be inclined to hold both parties negligent for their mutual failure to procure sound equipment, or other rescue *244 apparatus, prior to their attempt to save the victims in the rapids. But we do not believe, in view of the extant emergency and the peril of the victims, that such omissions can be characterized as negligent (Wrynn v United States, 200 F Supp 457). Rather, we prefer to regard the entire transaction as a heroic attempt at rescue, fraught with danger and, ultimately, unsuccessful. If errors were made, they were errors of judgment in circumstances which do not permit an inference of negligence, and consequent liability.
STATUTORY LIABILITY
Claimant advances a statutory basis upon which to assess the loss of its helicopter in the abortive rescue attempt against the State. It cites section 79-f of the Civil Rights Law (added by L 1967, ch 134), which provides in relevant part: "1. Notwithstanding any inconsistent provisions of law, general or special or local, the state shall save harmless and protect any person who, upon being lawfully commanded, renders assistance to a police officer employed by the state in the performance of his duties, from any financial loss arising out of any claim, demand, suit or judgment by reason of alleged negligence, other than gross negligence, or an alleged tortious act of the person rendering such assistance which results in bodily injury or property damage * * * any agency of the state shall save harmless and protect any person who, upon being lawfully commanded, renders assistance to a police officer of such agency in the performance of his duties, from any financial loss arising out of any claim, demand, suit or judgment by reason of the negligence, other than gross negligence, or an alleged tortious act of the person rendering such assistance which results in bodily injury or property damage.”
The foregoing statute expresses an intention on the part of the Legislature to compensate citizens in certain situations for losses sustained when they come to the aid of police officers. The question which we must determine is whether the damage sustained herein is covered by the statute, and provides a basis upon which to shift the loss to the State. McKinney’s and Shephard’s reveals no reported cases which discuss the scope of the statute. In those few reported cases in which the statute is cited (Wein v Levitt, 42 NY2d 300, 305; Schanbarger v Dott’s Garage, 61 AD2d 243, 245; Brody v Leamy, 90 Misc 2d 1, 25) it is merely mentioned; its application to particular sets of facts is not evaluated. Therefore, the language of the *245 statute and its legislative history must form the basis for discerning the breadth of situations which the Legislature intended to cover.
The legislative history is contained in the bill jacket to chapter 134 of the Laws of 1967 which contains the comments made to the Governor’s counsel at the time it was under consideration for approval by the Governor. Included therein is the Senate sponsor’s memorandum as well as the comments of a number of agencies and organizations interested in the subject matter of the legislation.
The comments of the Association of the Bar in the City of New York are particularly instructive on the question currently before the court. Their comments were initially addressed to Senate Introductory No. 3-A, prior version of the bill (designated Senate Int No. 3-B) ultimately approved by the Governor. That bill provided: "The state shall be liable and shall assume liability, to the extent that it shall save harmless (and protect) any person who, upon being lawfully commanded, renders assistance to a police officer employed by the state” (italicized material deleted from Senate Int No. 3-B; material in parentheses added to Senate Int No. 3-B). In recommending disapproval of Senate Int No. 3-A, the association stated:
"One ground for our disapproval of the bill is its ambiguity with respect to whether it creates a direct cause of action by the injured person against the State or municipality. Section 1 of the bill provides not only for the assumption of another’s liability but also that 'the State shall be liable’, which clause, as the bill is structured, may not be modified by 'to the extent it shall save harmless * * *’ Thus, the State and municipalities could be directly liable 'for damages alleged to have been sustained as a result of such person’s act.’ On the other hand, the phrase 'shall be liable’ may be surplusage, which would be a reading probably more consistent with the purpose of the bill.
"If such ambiguity is resolved in favor of creating a direct cause of action, deleterious consequences could ensue. Claimants might be able to bring actions directly against public bodies without complying with statutory requirements for notices of claim, for the bill departs from the present pattern of the law and does not require the formal filing of a notice of claim.”
As amended by the Legislature and approved by the Gover *246 nor, the ambiguous language referred to by the association was changed. In their comments upon Senate Introductory No. 3-B, which contains the precise language relied upon by claimant herein, the association, although recommending disapproval on grounds irrelevant to our present inquiry, commented: "S. 3-B makes clear that the bill creates no direct liability on the part of the State or municipality, thereby curing an ambiguity we noted in our report.”
Although the foregoing observations of the association are not controlling, considering their context and the changes made by the Legislature and approved by the Governor, they deserve to be accorded substantial weight in our deliberations herein.
The comments of the sponsor of the bill relied on by claimant should be noted as well. (See NY Legis Ann, 1967, p 13.) Senator Thomas F. McGowan explained the purpose of the legislation as being "to encourage the general public to take an interest in assisting law enforcement officers in the performance of their duties.” It is no doubt true that to compensate claimant herein would encourage such public assistance. But the situations envisioned by Senator McGowan and ultimately encompassed within the legislation do not include the instant fact pattern. Rather, the Senator noted that while, prior to the instant legislation, provision was made for those who suffered personal injury or property damage when aiding police officers in arresting wrongdoers (formerly Penal Law, of 1909, § 1848, now General Municipal Law, § 71-a), a void existed in the event such persons were later sued for damages. "There is no provision for the protection of this legal 'good Samaritan’. At the present time, should he be sued along with the police officer, the agency concept is not actuated automatically. This means that a person called upon by a police officer may very well end up having to provide his own counsel and should it be determined that there is liability attached to his action, either because of his affirmative act or due to the original requester (the police officer), exercising illegal authority or going beyond that authority.” [sic] (NY Legis Ann, 1967, pp 13-14.)
Clearly, the ameliorative action of the Legislature goes so far as to hold harmless the volunteer when his acts, or the actions of those chargeable to him might cast him in liability for damages to another. It does not provide a basis upon which to award damages against the State for property losses suf *247 fered in incidents such as the one at bar. Absent common-law liability, there is no statutory basis upon which to make the award herein sought.
This may appear to be an unjust result, particularly in the instant claim where a serious loss has been suffered, through no fault of the litigants, in an unselfish attempt to aid victims in distress. If legal responsibility exists, it may well be against the victims under the rescue doctrine. The victims are, of course, not before this court, and any determination as to their ultimate responsibility (the timeliness of which may well be subject to question if action has not already been instituted) must be made elsewhere. Any other remedy lies in the province of the Legislature. It must weigh the policy considerations as to whether an expansion of the class of volunteers who should be made whole when they suffer a loss while aiding police officers is appropriate. Such considerations fall on both sides of the issue, and range from the prevention of fraud to the encouragement of citizen aid. The judiciary must not encroach upon the legislative prerogative but can only interpret and apply the will of the Legislature. Here, that will results in a loss to claimant and, no matter the extent to which equity and conscience may dictate otherwise, under the rules of common law and the prevailing statutes there exists no basis of recovery and the claim must be dismissed.
The State’s motion to dismiss, made at the close of evidence, is hereby granted, and the clerk is directed to enter judgment accordingly.