**Harold REHM and Mary Rehm, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 19177.**

United States District Court
E. D. New York.

July 11, 1961.

Martin M. Kolbrener, New York City, for plaintiffs.

Joseph P. Hoey, U. S. Atty., Brooklyn, N. Y., by Philip Silverman, Asst. U. S. Atty., New York City, of counsel.

RAYFIEL, District Judge.

This is an action under the Federal Tort Claims Act (Title 28 U.S.Code §§ 1346(b) and 2671 et seq.) for the recovery of damages sustained by the plaintiffs as a result of a collision between an automobile owned and operated by the plaintiff Harold Rehm, hereinafter called Harold, and an airplane owned by the defendant and piloted by one of its officers or employees.

At about 8:30 p. m. on October 15, 1958, while Harold was operating his 1953 Pontiac automobile in an easterly direction along the Southern State Parkway, in this District, a large troop-carrier airplane, owned by the defendant and operated by one of its officers or employees, having exhausted its supply of fuel, was caused to make a forced landing on the parkway in or near the path of Harold's automobile, colliding with it, and causing Harold and his wife, the plaintiff Mary Rehm, hereinafter called Mary, to sustain the injuries which are the basis of this action.

In a companion case, Schneider v. United States of America, D.C., 188 F.Supp. 911, 915, my colleague, Judge Mishler, having found that the accident which resulted in the injuries sustained by the plaintiff therein was occasioned by "some negligent act of commission or omission of the defendant, its agents, servants or employees," granted judgment to the plaintiff. Thereafter plaintiffs' motion for summary judgment herein, unopposed, was granted, and this action proceeded to trial on May 25, 1961 for the purpose of assessing the damages sustained by the plaintiffs.

As hereinbefore stated, Harold was operating his car at the time of the accident. Mary was seated to his right. The collision forced open the door alongside Mary, causing her to be thrown from the car in such a position that her right foot became wedged between the car and the curb which bordered the Highway. She remained in this position until approximately half an hour later when the automobile was raised, permitting her foot to be extricated. Harold and Mary were then removed to the Southside Hospital where it was learned, as appears from the hospital reports, (Plaintiffs' exhibit No. 4) that Mary sustained

(a) a fracture of the right external malleolus,

(b) a fracture at the base of the 4th metatarsal bone of the right foot,

(c) a laceration of the deltoid ligament of the inner aspect of the right ankle,

(d) a tear fracture of the articular surface of the metatarsal head of the right foot,

(It is true, as the defendant claims, that the fracture was not discernible on the x-ray which was taken—it appears in the x-ray reports—but Dr. Manning, who treated her, stated that he actually saw the fracture, and, while his testimony as to other matters was in some respects unpersuasive, I am inclined to believe his statement that he saw the fracture).

(e) a fracture of the great multangular bone of the right hand, and

(f) damage to the soft tissues of the big toe of the right foot.

Her fractures were set, the area of the wounds cleaned, and her right leg placed in a cast running from her groin to her toes, while her right hand was placed in a cast which extended to her elbow. She remained in the hospital for a period of five days, returning to her home on October 20, 1958. About six weeks thereafter Dr. Manning removed the leg cast, replacing it with one which extended from a point below the knee to the toe, and on or about December 30, 1958 he removed that cast and applied an elastic bandage. Dr. Manning visited her several times in January, 1959, finding on each succeeding occasion an improvement in her condition, a reduction in the swelling of the area involved, and less limitation of motion. He examined her again in February and March of that year, finding her further improved, and suffering only minimal pain.

Dr. Manning examined her again in March, 1961, when he found, as he stated, a 10 to 15 per cent limitation of motion. He testified that an x-ray which he took at that time disclosed an arthritic formation in the area of the *internal* malleolus. (it was the *external* malleolus which sustained the fracture) In his report of his March examination (plaintiffs' exhibit No. 6) he prognosticated that Mary *may* develop a traumatic arthritis which may necessitate a fusion of the ankle. He made still another prognosis respecting the possibility of addi-

tional surgery involving the first metatarsal phalangeal joint. Neither his testimony nor his highly conjectural prognoses concerning those matters impressed me.

Mary claims also to have suffered a severe neurosis as a result of the accident. She testified that since then she has frequently been in a state of hysteria, causing her to tremble violently; that she has nightmares several times a week, followed by crying spells, and is generally highly irritable and neurotic. All of those conditions she attributes to the accident. Physicians who testified in her behalf stated that the accident of October 15, 1958 was a competent producing cause of those conditions, and expressed the opinion that they are of a permanent nature. Medical experts called by the Government expressed contrary opinions respecting not only the origin of the neurotic condition but also its permanency. We are faced then with the almost customary situation where a court or jury, untrained in the art or science involved, is called upon to evaluate the testimony of physicians, and to resolve clear conflicts between equally or nearly equally qualified experts as to such frequently vague, hazy and nebulous items of damage as future pain, permanency of injuries and neurosis.

Quite understandably Mary suffered an appalling experience when she saw the large airplane land on the Parkway and approach the car in which she was riding. She undoubtedly sustained a shock to her nervous system as a result thereof. She probably retained for some period of time a searing memory of the occasion. But I do not believe that the neurotic condition attributable to the accident exists any longer. Her testimony, particularly that involving her claim of present neurosis, was not convincing. She was glib, demonstrative and highly voluble on direct examination, with a penchant for exaggeration, while on cross examination she was frequently evasive and equivocal.

It is my belief that whatever neurosis she now has antedated the accident in question. There was testimony to the effect that some three years prior to the accident she submitted to a comprehensive examination by her physician because of her expressed but unfounded fear that she was suffering from a heart condition. Her post-accident neurosis was I believe, an aggravation of her pre-existing neurosis. During the course of the trial, except for a very brief period early in her own testimony, she appeared to be quite composed, and this despite the fact that during the direct and cross examination of many of the medical witnesses very frequent and detailed reference was made to the accident, the operative procedure employed, and the manifestations of neurosis alleged to have been precipitated by the accident.

Except for the perceptible limp, which I believe will be permanent, there has been a good recovery of the fracture areas. There are some resultant scars. There is slight limitation in the right ankle and some loss of strength in the right hand. Obviously, she has suffered considerable pain, particularly while awaiting her removal to the hospital, and it is likely that during changes in the weather she may experience some pain or discomfort. I believe, also, that she suffered a severe shock to her nervous system as a result of the pending, and then actual, collision of the two vehicles, from which, however, I believe she has substantially recovered.

As to Mary's claim for damages

Reference should be made particularly to two items of damage claimed by Mary. One involves the professional services rendered to her by Dr. Manning. On the basis of the nature and extent of his services in connection with the operation, the economic condition of the plaintiffs, and other factors, it is my considered opinion his fee therefor is excessive. Dr. Manning admitted that in fixing his fees he took into consideration the fact that they involved a claim which was in litigation with the Government.

The other is the claim for wages alleged to have been paid to Mary's mother

for household services performed for Mary during her incapacity. Her mother, now deceased, was 79 years of age at the time, and for some period prior thereto had been supported by her sons Mary's brothers, who continued to provide for her during the period of her alleged employment by Mary. Mary stated that she paid her mother $35 per week for her services. The total available income of the Rehm family, including a contribution from her son, was not over $70.00 per week. I do not believe that she paid her mother for such services as she may have performed for her.

■ Mary is entitled, in my opinion, to the following compensation:

| | | |
|---|---|---:|
| (a) | For the aforementioned injuries to her foot and hand, and the past and future pain and suffering incidental thereto | $ 20,000 |
| (b) | For the limp | 5,000 |
| (c) | For the shock occasioned by the accident and the consequent aggravation of her pre-existing neurosis | 10,000 |
| (d) | Operation by Dr. Manning | 500 |
| (e) | 15 visits to Dr. Manning, x-rays and miscellaneous matters | 635 |
| (f) | Southside Hospital bill | 215.50 |
| (g) | Dr. Rossman | 75.00 |
| (h) | Dr. Kaufman, anesthesist | 60.00 |
| (i) | Dr. Strully | 50.00 |
| (j) | Dr. Tuby | 50.00 |
| (k) | Mr. Namioli, physiotherapist | 168.00 |
| | | $36,753.50 |

As to Harold's claims for damages

Harold sustained a comminuted fracture of the right patella. Shortly after his arrival at the Southside Hospital after the accident a cast extending from his groin to his ankle was applied, and he returned to his home the same night. Some eight weeks later the cast was removed. He was unable to resume his work until the week following such removal. He was employed at the Central Islip State Hospital as an attendant, receiving a bi-weekly salary of $115.-35, so that his loss of earnings amounted to $519.08. The Government contends that his loss was $346.08, basing its calculations on a complex formula adopted by the State of New York, under which the employee's daily compensation is fixed on the basis of a 7-day week, although his work week covers but five days. Calculation of Harold's loss of earnings by that formula would deprive him of compensation for his lost vacation, sick leave and personal leave time. I disagree with the Government's contention.

Harold has made a good recovery from his injury. The fracture has healed well, and his only discomfort is fatigue which he occasionally experiences after standing, walking or driving for substantial periods of time.

As is true of his charges for professional services (the operation) rendered to Mary, I believe Dr. Manning's fees for the treatment of Harold are excessive.

■ Harold is entitled to the following compensation:

| | |
|---|---:|
| For the injury sustained by him | $5,000.00 |
| For loss of earnings (9 weeks) | 519.08 |
| Hospital bill | 25.00 |
| Damage to Pontiac automobile (loss covered by insurance, except for $50.00 deductible provision) | 50.00 |
| Services of Dr. Manning for setting fracture, applying and removing cast | 250.00 |
| Dr. Manning—four visits | 60.00 |
| Dr. Tuby | 35.00 |
| | $5,939.08 |

Accordingly, judgment is granted in favor of Mary Rehm in the sum of $36,-753.50 and in favor of Harold Rehm in the sum of $5,939.08.

Submit, on notice, within ten days, a decree in conformity herewith.