**Grace YARROW, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 65 Civ. 2873.**

United States District Court, S. D. New York.

Feb. 20, 1970.

Julian, Glaser & Blitz, New York City, for plaintiff, Cecil J. Badway, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, for defendant, Brian J. Gallagher, David M. Brodsky, Asst. U. S. Attys., of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW.

LEVET, District Judge.

This is an action by plaintiff, Grace Yarrow, against the United States of America for damages allegedly sustained by her on February 25, 1965, when an automobile in which she was a passenger was involved in a collision with a vehicle owned and operated by an agency of defendant at the intersection of Canal and West Streets, Borough of Manhattan, City and State of New York.

The defendant conceded liability and negligence with respect to its ownership and operation of its automobile (3).[1] The question of damages was tried to the court without a jury.

After hearing the testimony of the parties, examining the exhibits, the pleadings and the Proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### HOSPITALIZATION AND INJURIES

1. On February 25, 1965, while a passenger in a vehicle driven by her father, plaintiff was injured when this vehicle and another vehicle, owned and operated by a federal governmental agency, were involved in a collision at the intersection of Canal and West Streets, Borough of Manhattan, City and State of New York (5–6).

2. At the time of impact of the vehicles, plaintiff was thrown about in the front seat, striking her head and face on a hard, solid surface (7–9). Plaintiff, in a dazed condition with certain pains and numbness in her body, was taken by ambulance to the emergency room of the Beekman-Downtown Hospital and examined by several physicians (10, 12, 15, 16). She had pains in her foot, head, face, chest and body (17, 18, 19). The injuries to her eye and nose were sutured in the emergency room by Dr. Suitor; her head, face, neck, legs and feet were X-rayed; and she was taken to a hospital bed (20–23).

3. On the date of the accident, the diagnosis of the Chief Resident at Beekman-Downtown Hospital was:

(a) Le Fort nasal maxillary fracture of zygoma.

(b) Cerebral concussion.

(c) Lacerations of the left eyebrow and nose.

(d) Fracture of the left second metatarsal base.

(e) Abrasions of the legs.

The Resident's notes also indicated that plaintiff's upper right incisor had been knocked out (Ex. 2, p. 7).

4. At least three examiners—the Chief Resident and two other medical staff members—checked plaintiff's condition on the date of the accident, February 25, 1965 (185; Ex. 2, pp. 4–7). One of the medical staff members reported "no definite history of loss of conscious [sic]," "slightly to moderately distress," "cooperative," "alert and oriented" (Ex. 2, pp. 4, 5). A second staff member indicated that plaintiff "was dazed but apparently not unconscious" (Ex. 2, p. 6).

Although the Chief Resident noted that plaintiff "was not unconscious," he diagnosed "cerebral concussion." Neither of the other two examiners reported a diagnosis of any concussion. The diagnoses of the Chief Resident and the two medical staff members are substantially similar in other respects.[2]

---

1. Unless otherwise identified, numbers in parenthesis refer to pages in the trial transcript.

2. The signatures of the two medical staff members in the hospital record were not completely legible. The court takes judicial notice that indecipherable handwriting is not uncommon in the medical profession.

It should be noted that the final hospital diagnosis prepared on March 24, 1965 omitted any reference to concussion and stated specifically that there was "no history of loss of consciousness" (see Finding of Fact 7).

5. The hospital record of X-rays taken February 25, 1965 failed to demonstrate any fracture involving the tables of the cranial vault. The X-ray record also revealed that the sella turcica appeared normal; the pineal gland was calcified; and the facial bones showed fractures of both maxillary bones, a fracture of the left zygomatic arch, and evidence of a diastasis fracture of the left zygomaticofrontal suture (Ex. 2, p. 21; 309–313). The accident was a competent producing cause of the above injuries (319) and could have caused pain (318).[3]

6. On February 26, 1965, physicians placed a pillow splint on plaintiff's left foot and leg and treated her cuts (24–25; Ex. 2, p. 26). The following day a nose specialist, Dr. Broones, set the fractures of plaintiff's nose (26–28; Ex. 2, p. 28). Dr. Anthony E. Bedrick, a specialist in oral and dental surgery, examined her on March 1, 1965 and made a diagnosis that plaintiff had a bilateral fracture of the maxilla or upper jaw running through the sinuses on each side, and a fracture of the left zygomatic arch (a combination of two bones that gives contour to the cheekbone) (289–290). Dr. Bedrick's treatment consisted of constructing and applying a headcap to reduce and fix the jaw fracture and hold it in place by means of elastic traction (289–290; Ex. 2, p. 11). The cap was tightened on March 2, 1965, at which time there was a "tremendous amount of edema or swelling" (292–293). The cap was again tightened on March 3 and March 4, and was adjusted on March 6 (293–295; Ex. 2, p. 11). The plaintiff was examined but no adjustments were made on March 5, 7 and 8 (295–296). On March 9, Dr. Bedrick removed the headcap and replaced it; there was some movement of the upper jaw (296–298).

By March 10, the edema and ecchymosis had subsided but plaintiff complained of some pain in her left ear (298–299); by March 11, the jaw fracture had been maintained in a good position and the edema had subsided, but plaintiff was still complaining of intermittent ear pains (299). Dr. Bedrick stated that he removed the headcap on March 15 (Ex. 2, p. 16; 300–301). At that time, March 15, plaintiff was fed by liquid and soft diet taken with a spoon (301, 302). On March 16, Dr. Bedrick found no complaints of any pain and said plaintiff had freedom of movement in the lower jaw but not in the upper jaw and there were signs that the fracture had healed (302). On March 19, when he examined plaintiff's teeth, he found that a portion of a molar tooth on the left side was fractured. The fractures of the maxilla and the zygoma showed satisfactory healing without functional disabilities and there was good occlusion (Ex. 2, pp. 2, 3, 31). The healing of these fractures did, however, result in a minimal flattening of the left cheek, which flattening has no functional effect and is not sufficiently marked to warrant plastic or other surgery (Ex. 2, p. 31; 314, 336–337).

7. The final hospital diagnosis, prepared March 24, 1965, reported the following injuries:

"1. Type II Le Fort fracture of the facial bones

"2. Fracture of the nasal bones, comminuted

"3. Fracture, second metatarsal bone, left

"4. Laceration of the left eyebrow and nose" (Ex. 2, pp. 2, 3).

---

3. The X-rays further revealed a comminuted fracture of the nasal bones. Although plaintiff produced no competent witness to testify that the accident was a competent producing cause of the nasal fracture, the court has considered plaintiff's testimony as to pain experienced during the setting of the nasal fracture (see Finding of Fact 14).

This final diagnostic summary differed from the initial diagnosis of the Chief Resident on February 25, 1965 in that the later diagnosis omitted any reference to concussion. The final report also noted "no history of loss of consciousness" (Ex. 2, pp. 2, 3; 205–206).

8. Plaintiff was discharged from the Beekman-Downtown Hospital on March 22, 1965 and referred to the outpatient clinic (Ex. 2, p. 2; 47). After she left the hospital, Dr. Bedrick saw plaintiff on March 29, 1965 and noted that she complained of pain in her left ear, but had no difficulty in talking. When he saw her April 12, 1965, she made no complaints of pain (304–305). On March 13, 1966, Dr. Bedrick found plaintiff's jaw in good condition with good healing (309).

9. There are three basic methods for diagnosing concussion: (1) direct observation; (2) reports of reliable witnesses; (3) close interview of the patient to uncover memory gaps at the time of the accident (Dr. Derby, 372). Upon the basis of the hospital records, Dr. Bennett M. Derby, a practitioner in neurology and neuro-pathology, concluded, and I find, that plaintiff did not suffer a concussion for the following reasons: (1) The records reflect no positive statements of loss of consciousness and some indicate the contrary (373–377) (see Findings of Fact 3, 4, 7); (2) The records indicate that plaintiff was alert, oriented and cooperative (373–377; Ex. 2, p. 2); (3) The prescription of demerol, which plaintiff refused (Ex. 2, p. 34; nurse's notes 2/25/65), would not have been given if the doctors seriously suspected concussion (374–375). Furthermore, plaintiff's vivid and detailed testimony at trial and on her deposition ruled out concussion (378–383).

In order to permit a diagnosis of concussion, it is necessary to have a loss of consciousness (Derby, 404, 407). A basic symptom in concussion is loss of consciousness (plaintiff's witness, Dr. Henry Wigderson, 194). A clear memory of all of the events surrounding an accident rules out concussion (Wigderson, 196, 202). Both Dr. Wigderson, for plaintiff, and Dr. Derby, for defendant, agreed that without a concussion there can be no post-concussion syndrome (193, 204, 387–388). Dr. Wigderson acknowledged that the chief complaints of plaintiff were all subjective and that there was no way to objectively measure "these things;" that the diagnosis of "post-concussion syndrome" was based upon the acceptance of these complaints and a history of the concussion; that his opinion was based upon the assumption of a concussion (203–204).

10. Plaintiff has failed to establish by a fair preponderance of the credible evidence that she sustained a concussion or post-concussion syndrome as a result of the accident.

11. Dr. Harvey B. Taterka, an ophthalmologist, who conducted an eye examination at the hospital on March 16, 1965, indicated "no diplopia" (double vision) and stated that myopia was the reason for any "blurred vision." (Ex. 2, p. 32; 219, 283) Although no diplopia was revealed at the hospital, Dr. Taterka subsequently found a late complication of plaintiff's facial injuries—a small field of horizontal diplopia in her extreme left lateral gaze (233, 262–263), resulting from fat atrophy which caused the left eye to sink inward and downward (244–245, 259–260, 262). The diplopia, however, affects plaintiff "only occasionally" (92) and may be corrected by lenses without surgery (264–265). It is doubtful that diplopia causes plaintiff to have headaches (Dr. Taterka, 265, 266). Although the diplopia may cause inconvenience, plaintiff is bound to correct it in order to mitigate her damages. Plaintiff wore glasses for reading prior to the accident (74) and now wears the same glasses for reading, television and movies (91).

12. Plaintiff's left eye has receded 4 millimeters and dropped 2–½ millimeters within the orbit as a result of the atrophy of the periorbital fat surrounding the eye (249–255, 259–260, 264).

## DENTAL INJURIES AND TREATMENT

13. Dr. Lawrence Slass, an orthodontist, examined plaintiff on July 1, 1965; took an X-ray film, and when plaintiff returned on July 6 took further X-rays and examined her mouth and charted her gum condition. On July 13, 1965 he made a clinical examination of plaintiff's mouth and teeth and a set of impressions were cast (115–118).

Dr. Slass testified, and I find, that as a result of the accident plaintiff sustained the following dental injuries:

(a) Fractured upper left first molar with a pulp exposure which required root canal therapy and a crown to rebuild the tooth (121).

(b) Fractured upper central incisor with a questionable prognosis (121). This tooth had been capped prior to the accident (135–136). The incisor was fractured horizontally in the accident and the portion which remained in plaintiff's mouth was loose. Later it appeared that the root was fractured lengthwise with the result that the tooth had to be extracted and a fixed bridge constructed (122). Dr. Slass made no definite statement as to any malocclusion as a result of the accident (148).

The treatment rendered by Dr. Slass was in substance as follows:

(a) For the upper left first molar he did a root canal therapy and constructed a full cast crown with plastic facing and repaired the tooth (123).

(b) He extracted the fractured upper incisor and constructed a fixed upper three-unit bridge to replace it (124).

(c) Other treatment was given but had no relationship to the accident (124).

## PAST PAIN, SUFFERING AND DISABILITY

14. The credible testimony of plaintiff with respect to the existence of past pain and suffering was substantially as follows: That immediately after the accident, at the hospital she had pains and numbness over her whole body and was in a dazed condition (10, 12); that at the hospital to which she was transported she had pains in her foot, head, face, chest and her whole body (17–19), pain in her head (23); that she suffered pain on February 27, when the nose fracture was set (26–28); that there were certain pains connected with the application and adjustment of the head-cap (29–36); that she had difficulty moving her jaws (39–40); that after the splint was removed from her foot she limped with some pain (40); that she had pain in her left cheek and through the left eye (46–47). Plaintiff testified that she has had headaches since the time of the accident, that they never got any better, and that they are worse now (54–55, 92–95).

After leaving the hospital she experienced pain behind the left ear, but took nothing for it and no doctor suggested that she take anything (94–95, 96). She also conceded that after she left the hospital she complained to no one about pain except to Dr. Suitor (97) and to Dr. Bedrick when she was an outpatient. From the time she saw Dr. Bedrick last in August, 1966 until the day of the trial she complained to no doctor about the head pain. She said she took aspirin (99). She said that she had some limitation in opening her mouth and, therefore, ate softer foods (100–101) and that she had some difficulty in eating such things as steak, apples and nuts (105). The pain near her ear, she testified on cross-examination, had not begun until about a year before the trial (109).

She admitted that while in the hospital she asked for no medicine or pain killers and that, although medicine was available to her, she only took a pill on one occasion (81–82). Additionally, Dr. Taterka and Dr. Bedrick indicated certain entries in the hospital record which, to some extent, discount the extent of plaintiff's claims of pain (281, 344–350). On March 4, 1965, plaintiff had no complaints; on March 5, the record states she had been very comfortable; on

March 6, she reported no discomfort, only slight pains at times; on March 7 and 8, the record states that she was in good spirits and with no complaints (345–346; Ex. 2, pp. 12–13). Other testimony supports plaintiff's claims of past pain to a limited extent. Dr. Slass, an orthodontist, testified that plaintiff expressed a feeling of pain in the left temporal mandibular joint and that he had difficulty in maintaining her mouth in a wide-open position for prolonged periods during his treatment (128).

15. The plaintiff has proved by a fair preponderance of the credible evidence that she is reasonably entitled to recover the sum of $10,000 for past pain, suffering and disability (i. e., from date of accident to date of trial).

## FUTURE PAIN, SUFFERING AND DISABILITY

As to future pain, suffering and disability, plaintiff must rely primarily upon the testimony of experts (see Discussion, infra).

16. Dr. Taterka, an ophthalmologist who testified for plaintiff in respect to her future condition, stated that when he examined her on October 19, 1969 she had an enophthalmos (a sinking of the left eye), and during an extreme left lateral gaze (when she looked left with both eyes) she had a field of double vision or diplopia.[4] Part of his findings were that the opening of the left eye was smaller than the right; the distance between the upper lid and the lower lid was smaller on the left side; and the normal depression of the upper lid sulcus was deeper on the left side than on the right. He found that these eye conditions were permanent. The remainder of his findings were normal (238, 239, 240).

Dr. Taterka specified two possible reasons for displacement of the eye: (1) Herniation of the orbital contents out of the orbit because of a fracture, in which case the condition would be apparent in about six weeks; or (2) Fat atrophy, a late complication which would not become manifest until much later. His opinion was that the cause of the displacement was mainly fat atrophy which came from hemorrhage and edema (259, 261–262, 267, 268, 270). Dr. Taterka further testified that the displacement of one eye could account for frontal headaches and that the displacement of the eye was permanent. However, he did not know whether frontal headaches would continue in the indefinite future. He added that there were surgical procedures to restore the eye in its normal condition, but that the surgery was difficult and not very reliable (249, 250, 251).

Although Dr. Taterka testified that the displacement of the left eye "could account for" frontal headaches, Dr. Derby found, and I now find, that plaintiff's ocular displacement is not a likely, probable or reasonable cause for any such headaches in the future. Dr. Derby stated that the displacement is minor and may cause minor cosmetic defects (390–391).

17. Dr. Wigderson, a neurological surgeon who testified for plaintiff, examined her on February 16, 1966 at the request of plaintiff's counsel (161–162) and made the following diagnosis: Cerebral concussion, post-concussion syndrome, fractured nose, facial bones and left metatarsal, and diplopia (double vision). However, his prognosis at that time was indefinite (165). Upon re-examination October 14, 1968, his diagnosis was essentially the same as before (166). The last time he examined plaintiff, on October 14, 1969, there was no objective evidence of pain—it was solely plaintiff's description (183–184). He also stated that plaintiff's facial bone injuries were not, in and of themselves, the cause of headaches nor proof of con-

---

4. Dr. Wigderson said that if diplopia were caused by the accident it would usually manifest itself shortly after the accident (213); but Dr. Taterka stated that diplopia in this case was caused by a late complication, as a result of the facial injuries (262) (see Finding of Fact 11).

cussion (190); and that there was no way to objectively measure her complaints of headaches (203–204). He acknowledged that her hospital record indicated her neurological status to be within normal limits (208–209).

Although Dr. Wigderson testified in his opinion that the plaintiff had suffered a concussion and that the complex of symptoms comprising the post-concussion syndrome (headaches, dizziness, memory impairment, difficulty in concentration, irritability, etc.) would persist (167, 180, 181).[5] These opinions are subject to serious question:

First, the court has found that plaintiff has failed to prove by a fair preponderance of the credible evidence that she sustained a concussion as a result of the accident (see Finding of Fact 10);

Second, both Dr. Wigderson for plaintiff and Dr. Derby for defendant agree that without a concussion there can be no post-concussion syndrome (see Finding of Fact 9).

18. On December 17, 1968, Dr. Derby conducted a complete neurological examination of plaintiff with the purpose of discerning abnormalities of function with respect to the cranial nerve, muscle power, gait, reflexes and coordination. He found, and I now find, that there were no abnormalities in any area of neurological function (e. g., mental status, coordination, motor power, sensation or cranial nerves); and that there was no way by which any alleged post-concussion syndrome could be verified (392–402). At the time of Dr. Derby's examination, plaintiff complained of severe pressure sensations in her head and occasional fleeting knifelike pains, and referred to these pains as headaches. However, Dr. Derby observed no objective symptoms or condition which would indicate any cause for headaches at that time (410–411).

19. Dr. Lawrence Slass, the orthodontist, gave no opinion as to the existence of *future* pains and made no definite statement as to any malocclusion as a result of the accident (148). Dr. Bedrick stated that he found no malocclusion in October, 1969 (316).

20. Although plaintiff testified at the trial that she has had headaches since the time of the accident (54–55, 92–95), she has failed to establish by a fair preponderance of the credible evidence that there is a reasonable certainty that she will suffer headaches in the future as a result of the accident.

21. I find that there is a reasonable certainty that plaintiff in the future will be subject to—

(a) an enophthalmos, or sinking, of the left eye;

(b) an opening of the left eye smaller than the opening of the right eye;

(c) an upper lid and lower lid at a lesser distance apart from each other on the left side than on the right side;

(d) an upper lid sulcus deeper on the left eye than on the right;

(e) diplopia;

(f) minimal flattening of the left cheek.

22. Plaintiff was 46 years old at the time of trial, and has a life expectancy of approximately 31 years.

23. Plaintiff has proved by a fair preponderance of the credible evidence that she is reasonably entitled to recover the sum of $16,000 for pain, suffering and disability in the future.

PAST LOSS OF WAGES

24. Before the accident plaintiff was employed by Economy Elevator Co., Inc. ("Economy") as a secretary and bookkeeper, working from 8:00 A.M. to 4:00 P.M., at a gross weekly salary of $100 (57–58). She was single, had been divorced in 1953, and had not remarried. Economy was a family corporation, principally owned by her father; she was also a stockholder (59–60).

---

5. After suggesting that effects of post-concussion syndrome would persist, Dr. Wigderson stated somewhat indefinitely that some effects "may clear up in a question of weeks or months and others go on forever." (209)

25. Plaintiff claims:

(a) Lost wages from February 25, 1965 to October, 1965 on the basis of $81.38 (net per week on a weekly salary of $100) for 34 weeks, amounting to $2,766.92 [6] (plaintiff's proposed conclusion of law 5(b)). This amount is conceded by defendant (defendant's proposed conclusion of law 10).

(b) Lost wages from March, 1968 to October 17, 1969, the date of trial, at a rate of $80.10 a week for a period of 19 weeks, totaling $1,521.90, and thereafter at a rate of $77.30 a week for the next 77 weeks, totaling $5,952.10, or a combined total of $7,474.00 (plaintiff's proposed conclusion of law 5(b)). This claim is disputed by defendant.

26. Plaintiff returned to work in October, 1965 (60). There was testimony as to her condition between the date of the accident and the return, and she was under medical care for some time during the course of the period when she did not work (49–54). During this period and for some time thereafter she was also visiting Dr. Slass' office for dental repairs (123–126). There was no testimony by any medical witness that plaintiff was unable to work at any time after October, 1965. The only testimony as to the period after October, 1965 is that of plaintiff herself—and such testimony is based solely on her own declarations or observations as to her condition.

27. In October, 1965, plaintiff returned to Economy to the same position with the same duties she had previously performed; when she got headaches she would stretch out on the couch for a time, several times a day, for periods of five minutes to a half hour (59–61). After her father died in September 1966 she became the sole owner of the corporation; the business was sold in March, 1968 (63–64). Although the new owners offered her a job, she did not accept it. The purchasers offered her the job a second time, but she again declined (65). In this connection, plaintiff conceded that when she received these offers of employment from the purchasers she did not explain her difficulties, but simply expressed no interest in the job. She did not ask if she could serve under the same conditions as she had before. She sought no other work (222–225).

28. I find that plaintiff is entitled to the sum of $2,766.92 for lost wages during the period from February 25, 1965 to October, 1965; but that she has failed to prove by a fair preponderance of the credible evidence that she has lost any other past wages as a proximate result of this accident.

## FUTURE LOSS OF WAGES

29. Plaintiff claims future lost wages from March, 1968 for the period of her life expectancy (plaintiff's proposed conclusion of law 5(b); see Finding of Fact 25). Obviously, the period between March, 1968 and October 17, 1969, the date of trial, is not a *future* loss.

Plaintiff appears not to comprehend fully the fact that *past* damages are said to occur *up to the time of trial* and *future* damages are said to occur *subsequent to the time of trial*. In any event, it seems that the claim of future loss of wages is predicated on an alleged loss of at least $77.30 per week for the period of plaintiff's *work* expectancy, although plaintiff refers incorrectly to *life* expectancy.

If allowable, any award of future wages would be subject to discount since a lump sum would be paid in advance of the period when such wages would actually have been earned.

30. The claim for loss of future wages was made belatedly by plaintiff. In her answers to defendant's interrogatories, which answers are dated December 27, 1966, plaintiff's counsel listed her claims for lost earnings at $3,400 (Exhibit A). No claim for future lost earnings was made in plaintiff's pretrial memorandum dated December 29, 1967,

---

6. Plaintiff worked from October, 1965 to March, 1968, and no claim is made for this period.

and filed October 8, 1968. No claim for future lost earnings was set forth in the pretrial order filed October 8, 1968.

Despite the above shortcomings of pleading, the court has considered all proof submitted on the subject of future loss of wages.

31. The evidence here shows (a) that plaintiff held the position at Economy before the accident (57–58); (b) that after the accident she returned to this position and, with some limitation, worked in the same office from October, 1965 to March, 1968 (59–61); (c) that after plaintiff's father died in September, 1966 and she became the sole stockholder, she sold the business in 1968 and discontinued work (63–64); (d) that after sale of the business, the new owners offered her the same position but she declined it twice without ascertaining if the owners would permit the same leniency that her father had permitted; there is no proof by plaintiff that she was worse off physically after the sale than before (65–66, 222–225).

32. Although plaintiff has established by a fair preponderance of the credible evidence that it is reasonably certain that she will experience pain, suffering and disability to some extent in the future as a result of the accident, there has been no medical testimony to demonstrate plaintiff's inability to work in the future.

33. I find that plaintiff has failed to prove by a fair preponderance of the credible evidence that she is reasonably certain to lose any future wages by reason of this accident.

## MEDICAL AND HOSPITAL EXPENSES

34. The fair and reasonable charges for Dr. Slass' services (consisting of dental work required because of the accident) up to the time of trial were:

| | |
|---|---|
| Root canal and work on the upper left first molar | $ 175.00 |
| Extraction of upper incisor | 15.00 |
| Construction of full crown on molar | 125.00 |
| Three-unit bridge to replace incisor | 740.00 |
| | $1,055.00 |

(146–147).

35. The parties agree that plaintiff had incurred the following expenses as a result of the accident:

| | |
|---|---|
| Medical expenses | $ 910.00 |
| Hospital expenses | 1,025.00 |
| | $1,935.00 |

(plaintiff's proposed conclusion of law 5(a); defendant's proposed finding of fact 15).

36. I find that plaintiff is entitled to the sum of $2,990 for past medical and hospital expenses required as a result of the accident. There is no claim for future medical or hospital expenses.

## DISCUSSION

■ The accident occurred in New York and this action arises under the Federal Tort Claims Act, 28 U.S.C. § 1346. Therefore, the measure of damages is governed by the law of New York. 28 U.S.C. § 1346(b); Hatahley v. United States, 351 U.S. 173, 182, 76 S.Ct. 745, 100 L.Ed. 1065 (1956); Klein v. United States, 339 F.2d 512, 517 (2nd Cir. 1964).

■ Having conceded liability, the defendant is responsible for those damages which result from and are a natural consequence of the accident. 13 New

York Jurisprudence 512, citing, among other cases, Steitz v. Gifford, 280 N.Y. 15, 19 N.E.2d 661, 122 A.L.R. 292 (1939).

The New York rule as to burden of proof of damages is set forth in Dunkel v. McDonald, 272 App.Div. 267, 70 N.Y. S.2d 653 (1st Dept. 1947), aff'd 298 N. Y. 586, 81 N.E.2d 323 (1948), as follows:

"A plaintiff seeking compensatory damages has the burden of proof and should present to the court a proper basis for ascertaining the damages he seeks to recover. They must be susceptible of ascertainment in some manner other than by mere conjecture or guess work. (Broadway Photoplay Co. v. World Film Corp., 225 N.Y. 104, 109, 121 N.E. 756, 758; Janvier, Inc. v. Baker, 229 App.Div. 679, 680, 243 N. Y.S. 173, 174.) However, where it is certain that damages have been caused by a wrong and the only uncertainty is as to the amount, there can be no good reason for refusing on account of such uncertainty any damages for the wrong. (Wakeman v. Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 4 N.E. 264; Bagley v. Smith, 10 N.Y. 489, 499; MacGregor v. Watts, 254 App. Div. 904, 5 N.Y.S.2d 525.) A wrongdoer may not escape liability simply because there are not available the ordinary standards for proving damages. The law will resort to some practical means that will be just to the parties. (Brady v. Erlanger, 188 App.Div. 728, 733, 177 N.Y.S. 301, 304, affd. 231 N.Y. 563, 132 N.E. 889; Alexander's Dept. Stores, Inc. v. Ohrbach's, Inc., 269 App.Div. 321, 328, 56 N.Y.S.2d 173, 179; Merscheim v. Musical Mutual Protective Union, 8 N.Y. S. 702, 704–705.)" (Id. at 270, 70 N. Y.S. at 656.)

The *extent of proof* as to the amount of injury required in New York has been stated as follows:

"The damages recoverable in tort actions cannot be contingent, uncer-

tain, or speculative [footnote omitted]; but if the fact is established that the plaintiff has sustained an actionable injury as the direct result of the defendant's wrongful act, reasonable certainty as to the amount of that injury is all that is required [footnote omitted]. * * * " 13 New York Jurisprudence 444, citing, among other cases, Steitz v. Gifford, 280 N.Y. 15, 19 N.E.2d 661, 122 A.L.R. 292 (1939); Tilley v. Hudson River R. Co., 24 N.Y. 471 (1862).

As noted by the court in Steitz, "[t]he fact that [damages] cannot be measured with absolute mathematical certainty does not bar substantial recovery if they may be approximately fixed." Steitz v. Gifford, supra, 280 N.Y. at 20, 19 N.E. 2d at 664.

The necessity of medical testimony to support a claim for *permanent* injuries in New York has been enunciated as follows:

"The future consequence of an injury, in a personal injury action, cannot be left to the speculation and conjecture of the trier of the facts, and it has been stated that medical testimony to support a claim for permanent injuries is necessary [footnote omitted]. Testimony of physicians may be the only means of arriving at a conclusion on the length of time an existing injury will continue [footnote omitted].

"In general, however, the necessity of expert testimony, to warrant submission of an issue as to permanency of an injury, depends upon whether the injury is one of an objective nature, such as the loss of an arm, leg, or other member, from which the jury may draw their conclusions as to future pain and suffering, [footnote omitted] or whether the injury is subjective and of such nature that laymen cannot with reasonable certainty know whether permanent injury will follow. [footnote omitted.]"

13 New York Jurisprudence 531–532, and cases cited, including Gallachicco v.

State, 43 N.Y.S.2d 439 (1943); 115 A.L. R. 1149; Webb v. Union R. Co., 44 App.Div. 413, 60 N.Y.S. 1087 (1st Dept. 1899); see 13 New York Jurisprudence 535 and cases cited.

■ There is no precise rule for fixing the value of pain and suffering; the trier of the facts must determine the value from all of the evidence in the particular case. Paley v. Brust, 21 App.Div.2d 758, 250 N.Y.S.2d 356 (1st Dept.1964); Robison v. Lockridge, 230 App.Div. 389, 390, 244 N.Y.S. 663 (4th Dept.1930).

However, as to future pain and suffering, " * * * [d]amages may be recovered only for such pain and suffering as it is reasonably certain will ensue [footnote omitted]—when it is reasonably certain from the evidence that such damages will necessarily result from the original injury [footnote omitted]." 13 New York Jurisprudence 534; Curtis v. Rochester & Syracuse R. Co., 18 N.Y. 534, 542 (1859); Clarke v. Westcott, 2 App.Div. 503, 37 N.Y.S. 1111 (1st Dept. 1896), aff'd 158 N.Y. 736, 53 N.E. 1124 (1899). Although "[a]bsolute certainty is not required as a basis for recovering damages for future pain and suffering," "[t]he degree of certainty required is 'reasonable certainty' * * *." 13 New York Jurisprudence 535, citing, among other cases, Ayres v. Delaware L. & W. R. Co., 158 N.Y. 254, 53 N.E. 22 (1899).

" * * * Recovery may be had for loss of future earnings provided they are shown with reasonable certainty and are not merely speculative in character [footnote omitted] * * *." 13 New York Jurisprudence 538, citing Dunkel v. McDonald, supra.

It has been held that "[l]oss of earnings is not recoverable in an action for personal injuries unless the plaintiff pleads this element of damages, [footnote omitted] and in order to recover for such loss, the plaintiff must show some basis upon which to compute the amount of his loss [footnote omitted]." 13 New York Jurisprudence 539; Neumann v. Metropolitan Tobacco Co., 20 Misc.2d 1013, 189 N.Y.S.2d 600 (1959); Nemorofskie v. Interurban Street R. Co., 87 N.Y.S. 463 (1904). The plaintiff "must show with reasonable certainty [footnote omitted] that he lost the wages in consequence of the injury, and how much they were [footnote omitted]." 13 New York Jurisprudence 539, and cases cited.

## MITIGATION OF DAMAGES

■ A person who has suffered by reason of a defendant's negligence is bound to use reasonable and proper effort to make the damage as small as practicable and to act in good faith to adopt reasonable methods to restore himself. 13 New York Jurisprudence 465–466, citing, among other cases, Lyons v. Erie R. Co., 57 N.Y. 489 (1874); Alberti v. New York, L. E. & W. R. Co., 118 N.Y. 77, 23 N.E. 35, 6 L. R.A. 765 (1889); see State of New York v. Samfred Beltline Corp., 31 A.D. 2d 865, 297 N.Y.S.2d 466 (3rd Dept. 1969).

Failure of the injured party to make a reasonable effort to minimize damages does not prevent all recovery but does prevent recovery of such damages as might have been avoided thereby. 13 New York Jurisprudence 453, citing, among other cases, Den Norske Ameriekalinje Actiesselskabet v. Sun P. & P. Assoc., 226 N.Y. 1, 122 N.E. 463 (1919).

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and of the subject matter of this action under 28 U.S.C. § 1346(b).

2. Concededly defendant is liable for all injuries and damages which were proximately caused by the accident in suit.

3. Plaintiff has proved by a fair preponderance of the credible evidence that she is entitled to recover the following amounts as damages sustained as a result of the accident:

(a) Past pain, suffering and disability
(from February 25, 1965 to the date
of trial) ............................$ 10,000.00
(b) Future pain, suffering and disability
(time subsequent to the trial .......... 16,000.00
(c) Past loss of wages .................... 2,766.92
(d) Future loss of wages ................. None
(e) Past medical and hospital expenses ...... 2,990.00

TOTAL DAMAGES .........$ 31,756.92

4. Plaintiff is entitled to damages in accordance with the provisions herein, with statutory costs.

Settle judgment on notice.