**Ernest J. MULLER, Jr.**

v.

**LYKES BROS. STEAMSHIP COMPANY, Inc.; SS DOLLY TURMAN, her engines, tackle, apparel, etc., SS DICK LYKES, her engines, tackle, apparel, etc.**

**Civ. A. No. 71–112.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Feb. 1, 1972.

---

Dan C. Garner, Von Hoene & Becker, James A. Wysocki, Windhorst, Heisler, deLaup & Wysocki, New Orleans, La., for plaintiff.

William E. Wright, Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for defendant.

## OPINION

R. BLAKE WEST, District Judge.

Plaintiff, Ernest J. Muller, Jr., a longshoreman, sued his employer, Lykes Brothers Steamship Company, Inc. (Lykes), for damages for personal injuries allegedly sustained by him in two separate accidents, on or about May 18, 1965 and November 27, 1968, which occurred, respectively, aboard the SS DOLLY TURMAN and the SS DICK LYKES, which injuries were the result of the alleged unseaworthiness of the two vessels on the dates in question. It is the holding of this Court, for the reasons that follow, that plaintiff's claim, based upon the accident of May 18, 1965, is barred by laches; that the accident of November 27, 1968 was proximately caused by conditions aboard the SS

DICK LYKES, which rendered that vessel unseaworthy; that plaintiff's own negligence was a proximate cause of his injury on November 27, 1968; and that there should be judgment in favor of plaintiff and against defendant in the amount of $25,000.00, plus costs and interest from date of judicial demand.

### The Accident of May 18, 1965 and Laches

■ In the accident of May 18, 1965, plaintiff suffered injury to his left leg, when he slipped on foreign matter on the deck of the SS DOLLY TURMAN. Plaintiff's slip and fall was reported the same or next day to his superintendent, and an accident report was prepared and submitted to the United States Department of Labor, Bureau of Employee's Compensation. Suit was not filed, however, until January 15, 1971, almost six years after the date of the accident, during which period of time no formal demand for damages was made upon Lykes by plaintiff. The Court holds that plaintiff's claim to recover damages for the accident of May 18, 1965 is barred by laches, because of: (1) plaintiff's inexcusable delay in instituting a suit, and (2) plaintiff's failure to rebut the presumption that Lykes was prejudiced by such delay. Pure Oil Company v. Snipes, 293 F.2d 60 (5th Cir., 1961).

"Admiralty courts traditionally apply the doctrine of laches wherever an applicable statute of limitations is lacking. A state statute of limitations applicable to a similar injury on land may by analogy furnish a yardstick to determine what constitutes laches." Norris, Maritime Personal Injuries. (2d Ed., § 78, p. 195). However, in Flowers v. Savannah Machine & Foundry Co., 310 F.2d 135 (5th Cir., 1962) the Fifth Circuit rejected Georgia's two-year statute of limitations and applied the three-year Jones Act limitation period in holding that laches barred a longshoreman's suit:

> ". . . we conclude that the Jones Act three-year period should be employed . . .

Of course it must be recognized at the outset that this does not displace the doctrine of laches. What and all that is done is that in the place of the local statutory period, there is substituted as the analogous reference guide the Jones Act three-year period. But while this does not eliminate the unavoidable problems for case by case adjudication and, moreover, does not achieve the millennium of certitude in this troublesome amphibious area, we think that adoption of the federal statute is both workable and sensible." 310 F.2d at 137.

Although a three year period has elapsed in a maritime case, laches might still be inapplicable where there has been no showing of prejudice by delay. "Though the existence of laches is a question primarily addressed to the discretion of the trial court, the matter should not be determined merely by a reference to and a mechanical application of the statute of limitations. The equities of the parties must be considered as well. Where there has been no inexcusable delay in seeking a remedy and where no prejudice to the defendant has ensued from the mere passage of time, there should be no bar to relief." Gardner v. Panama R. Co., 342 U.S. 29, 30, 72 S.Ct. 12, 13, 96 L.Ed. 31, 36 (1951); Vega v. The Malula, 291 F.2d 415 (5th Cir., 1961).

■ However, once the applicable period of limitation has run, there arises a presumption that the defendant has been prejudiced by delay, and the burden shifts to the plaintiff to show an excusable basis for the delay and an absence of prejudice to the defendant. La Lande v. Gulf Oil Corporation, 317 F.Supp. 692 (W.D.La., 1970). In Morales v. Moore-McCormack Lines, 208 F.2d 218 (5th Cir., 1953) the Court ordered dismissal of suit for the plaintiff's failure to carry his burden of rebutting the presumption of laches:

> "It will not do, as appellants seem to insist they may, to claim that under this showing of negligent delay, the

burden of showing prejudice in fact was upon the respondent. It is settled law: that in situations of this kind, where the libel shows on its face that it is barred by laches, prejudice to the respondent is presumed until the contrary is made to appear; that it is incumbent on the libellant to show facts excusing the delay; and that the libellant has the burden of rebutting the presumption of prejudice." 208 F.2d at 221.

As has been stated, the instant suit was instituted almost six years after the accident of May 18, 1965. Plaintiff admits in written brief that "there was inexcusable delay in filing suit almost six years after the injury", but denied that Lykes was prejudiced by the delay. Plaintiff emphasizes that both criteria must be met to establish laches.

> "Laches is much more than time. It is time plus prejudicial harm, and the harm is not merely that one loses what he otherwise would have kept, but that delay has subjected him to a disadvantage in asserting and establishing his claimed right or defense." Point Landing, Inc. v. Alabama Dry Dock & Shipbuild. Co., 261 F.2d 861, 865 (5th Cir., 1958).

However, plaintiff offered absolutely no evidence at the trial of this matter to rebut the presumption of inexcusable delay and resultant prejudice. In fact plaintiff's own testimony was indicative of prejudice to Lykes. Plaintiff testified that he had related the circumstances of his accident to another longshoreman working in the hatch and showed him the grease and oil on his (plaintiff's) trousers. This fellow worker died before Lykes had any notice that suit would be filed by plaintiff. The death of an important witness has been held to constitute prejudice so as to require the application of laches.

> "Timely notice would enable respondent to prepare its defense but nothing will take the place of prompt institution of suit and resulting avoidance of prejudice arising from death

or forgetfulness of witnesses. (Cleary Brothers, Inc. v. Luria Steel and Trading Corp., 198 F.Supp. 567, 570 (S.D.N.Y.1960))." West African S/S Co. v. McAllister Bros., Inc., 287 F.Supp. 102, 103 (S.D.N.Y., 1968).

Plaintiff contends that Lykes was not prejudiced by the delay in filing suit because it had notice through the submission of an accident report shortly after the occurrence of the accident. In La Lande v. Gulf Oil Corporation, *supra*, there was a delay of four years and eleven months between the date of the accident and the date of filing suit. The defendant had notice of the accident through filing of an accident report, but the Court remarked that the defendant had no cause to investigate because it was not on notice that any claim of negligence or unseaworthiness was forthcoming. Similarly, defendant in the present case had no reasonable basis to anticipate suit nor reasonable cause for investigation, and consequently is prejudiced by the inexcusable delay in institution of this proceeding.

Since there was inexcusable delay in filing suit and plaintiff clearly has failed to meet his burden of overcoming the presumption of prejudice to Lykes, plaintiff's suit, insofar as it relates to the accident of May 18, 1965, is barred by laches.

*The Accident of November 27, 1968*

In the afternoon of November 27, 1968 plaintiff's right knee was forcefully struck by a steel cable which broke while under strain and whipped against his leg. At the time Mr. Muller was the foreman of a longshoremen crew that was ordered to stow in the No. 3 hatch of the SS DICK LYKES heavy cargo contained in a large wooden crate. The crate was about ten feet high and, with its cargo, weighed about 37½ tons. A crane barge had lifted the crate from a barge alongside the SS DICK LYKES and lowered the crate onto a floor of dunnage in the lower portion of the No. 3 hatch. The cargo loading plan specified that this crate was to be stowed in

the inshore wing of the hatch, but, since there was not sufficient clearance between the dunnage floor and the overhead coaming in the intended stowage area, plaintiff's superiors changed the loading plan so as to provide that the crate should be stowed in the offshore wing.

Because of his prior experience with "heavy lifts", foreman Muller was assigned the task of "snaking" or "bulling" the crate from the square of the hatch into the offshore wing across the dunnage floor. The procedure for moving the crate into the offshore wing entailed the use of two winches on the top deck which could be simultaneously operated by one man. The ship's normal cargo runners (cables) were removed from the winch drums and replaced with heavier steel cables for the intended movement. The desirable arrangement for the rigging of the cables to the winches involved the making of a "double purchase" in order to halve the strain on the cable. The rigging of the cable to the offshore winch included the making of a "double purchase", but the rigging of the cable from the inshore winch included only a "single purchase" because the cable on that side was not of sufficient length to enable the creation of a "double purchase". Hence, the strain on the inshore cable was twice as great as that on the offshore cable.

After the crate was rigged, Mr. Muller, who was in the No. 3 hatch with his men, ordered them into the wings of the hatch and out of the ambit of danger in the event that a cable should snap. Mr. Muller remained in the square of the hatch, however, in order to remain visible to the winch operator on the deck above who would receive signals from Mr. Muller. When all appeared ready, Mr. Muller signalled to the winch operator to initiate movement of the crate. Before the crate had moved more than a few inches, the strain was too great for the "single purchase" portion of the cable from the inshore winch, which snapped and whipped into the offshore wing but did not at this time strike anyone nor do any damage.

Upon the failure of the cable, Mr. Muller asked the stevedore superintendent, Mr. Johansen, for a new cable. The superintendent, knowing of no cables at or near the ship, telephoned the Lykes supply office and requested that a new cable be sent. The superintendent was informed, however, that the office had no cables and that he would have to "make do with what you have."

The assistant foreman, Mr. Nunamaker, who was on the top deck with the superintendent, suggested that the two ends of the broken cable be tied together, and the superintendent passed on to him the instruction to do the best he could with what he had. Mr. Nunamaker then proceeded into the hold and tied the two ends of broken cable together with the use of a cable clamp. Testimony indicated that Mr. Nunamaker customarily relayed instructions from the stevedore superintendent, and Mr. Muller testified that he presumed that Mr. Nunamaker was following orders when he tied the loose ends of cable together.

After the crate and cable had been re-rigged by Mr. Nunamaker, Mr. Muller assumed approximately the same position he had before in the square of the hatch and signalled to the winch operator to place a strain on the cables. Immediately thereafter the cable snapped again, this time in the bight of the bowline where the two ends touched. The end of the cable leading to the winch whipped aft and struck Mr. Muller, the knot and the cable clamp striking him forcefully in the area of his right kneecap.

### Unseaworthiness

█ █ It is trite, but perhaps necessary, to note at this point that plaintiff, a longshoreman foreman who performed aboard vessels the duties traditionally performed by seamen, was entitled to the warranty of seaworthiness by Lykes. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

Lykes violated the warranty of seaworthiness by providing plaintiff with a cable inadequate to the task to be performed. The fact that the cable was not reasonably fit for its intended purpose rendered the vessel unseaworthy. Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). The Court further holds that this unseaworthiness was a proximate cause of plaintiff's injury.

### Contributory Negligence

The record discloses that plaintiff was fully aware of the defective and dangerous condition of the cable. Indeed, he had witnessed the snapping of the cable in its "single purchase" segment on the first attempt to stow the crate. That he was aware of the hazardous nature of the undertaking was shown by his commendable conduct in instructing his gang to move into the wing out of range of the rigging. Mr. Muller, however, positioned himself in the square of the hatch so that he might maintain visual contact with the winch operator. The space occupied by Mr. Muller was directly in the path of the cable if it should break again, which occurrence he had ample reason to expect. There was clear testimony that there were other positions in the hatch at which plaintiff could have stationed himself and still have maintained visual contact with the winch operator without exposing himself to the danger of injury in the likely event that the cable broke a second time. The assistant foreman, Mr. Nunamaker, testified that he would not have stood where Mr. Muller did in signalling the operation to commence and that plaintiff could have done his job properly by placing himself in a relatively safe position.

When a maritime worker continues to work under conditions known to be dangerous and is injured, he may be found to be contributorily negligent. DuBose v. Matson Navigation Company, 403 F.2d 875 (9th Cir., 1968). It is the holding of the Court that plaintiff was negligent in occupying a position well known to himself to be unsafe, particularly when a safer position was easily available, and that such negligence was a proximate cause of his injuries.

In point is the decision of the Fifth Circuit in Superior Oil Company v. Trahan, 322 F.2d 234 (5th Cir., 1963), in which Trahan was injured when he fell while boarding respondent's vessel. The Court held, at 322 F.2d 237:

"The District Court also found that Trahan was an experienced seaman and should have been fully cognizant of the danger involved in making the transfer. Trahan contends that since he was using the only method available in making the transfer, he could not have been contributorily negligent. This would be the correct rule only if in so doing, he had exercised reasonable care in the circumstances."

Also in point is Boudreaux v. Sea Drilling Corporation, 427 F.2d 1160 (5th Cir., 1970), in which an experienced oil field drilling foreman was injured when a wire rope on a crane broke. The crane and wire rope were being used to lower a nine ton ramp to the bow or poop deck of a drilling tender. The foreman positioned himself on the ramp itself in order to be able to give signals to the crane operator. The cable suspending the ramp gave way, and the plaintiff was thrown to the deck and injured. Unlike the present case, the cable itself was not defective. Mr. Boudreaux himself had rigged the cable improperly by "singling" the line rather than "doubling" or "tripling" it. On these facts, the Court held that:

"The plaintiff himself was in full charge of the operation. He himself, chose, in violation of custom on the drilling platform and ordinary operating procedure to use only a single line when he was concerned about the fact that the line was only single. As found by the trial judge, there was no reason why the plaintiff could not and should not have rigged the line correctly by doubling or tripling it. There was no convincing evidence that

706

the cable, called upon to lower a load somewhat in excess of its safety factor adjusted capabilities, was defective. On the other hand, the evidence shows that *the plaintiff knew that it was unsafe to position himself on the bow ramp and have it lowered any distance*. These separate acts of negligence on the part of plaintiff himself brought about his own unfortunate accident. He cannot use them as the basis for any recovery against his employer." (Emphasis added) 427 F.2d at 1161.

Like Mr. Boudreaux, plaintiff herein was a foreman in full charge of a cargo loading operation. Plaintiff's contributory negligence was an important proximate cause of the accident, and his recovery of damages must be reduced by the percentage of his contributory negligence, which percentage the Court finds to be 50%.

### Mitigation of Damages

■ Plaintiff's recovery must also be diminished because of his failure to mitigate his damages. The applicable rule was stated in Murphy v. American Barge Line Co., 169 F.2d 61, 64 (3rd Cir., 1948); cert. den. 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406 (1948):

"The authorities are uniform that, except in cases involving grave and severe operations, one must follow the expert recommendation of physicians or be precluded from recovering damages which might have been avoided thereby."

The treating physician, Dr. Irving Redler, testified that he was visited by the plaintiff on numerous occasions for treatment of injuries to his right knee. Mr. Muller is 5'11" tall and weighs approximately 320 pounds. Dr. Redler referred Mr. Muller to Dr. Allan Goldman with instructions to submit to a weight reduction program for the express purpose of relieving stress on the injured knee. Mr. Muller cooperated with Dr. Goldman's program for about five months, during which period he re-

duced his weight to 265 pounds. The plaintiff thereafter tired of the weight reduction program, discontinued treatment, and regained all of his former weight. By way of explanation, the plaintiff remarked to Dr. Redler that, "You are trying to do something with me that you just can't do."

In a similar case, Rapisardi v. United Fruit Company, 441 F.2d 1308, 1312 (2d Cir., 1971), a plaintiff's recovery was reduced for his failure to follow reasonable and competent medical advice:

"But even if Rapisardi is unemployable as a marine carpenter the damage award remains faulty in several respects. First, he refused to wear the eye patch prescribed by Dr. Kara. Wearing an eye patch is quite different from submitting to painful surgery of questionable value, and under the circumstances he was obligated to mitigate damages, . . . ."

The rule was recently expressed in Yarrow v. United States, 309 F.Supp. 922, 932 (S.D.N.Y., 1970):

"A person who has suffered by reason of a defendant's negligence is bound to use reasonable and proper effort to make the damages as small as practicable and to act in good faith to adopt reasonable methods to restore himself.

Failure of the injured party to make a reasonable effort to minimize damages does not prevent all recovery but does prevent recovery of such damages as might have been avoided thereby."

See also Quadrino v. S. S. Theron, 436 F.2d 959 (2d Cir., 1970); Kapuschinsky v. United States, 259 F.Supp. 1 (D.S.C., 1966); Young v. American Export Isbrandtsen Lines, Inc., 291 F.Supp. 447 (S.D.N.Y., 1968).

In failing to follow the competent medical advice of Dr. Redler and Dr. Goldman, the plaintiff has neglected his duty to minimize damages, and his recovery of damages must be reduced accordingly.

The medical testimony was consistent to the effect that Mr. Muller is unable to return to longshoreman work. How-

ever, all of the physicians agreed that plaintiff is capable of pursuing sedentary employment and that vocational training is available to plaintiff free of cost. In this regard, it was held in Alexander v. Meiji Kaiun K. K., 195 F. Supp. 831, 834 (E.D.La., 1961):

> "According to his testimony Alexander should not return to longshoreman work. But this does not mean that Alexander is unemployable for all purposes. Consequently, though the fact that he cannot return to his occupation must be considered in determining damages, nevertheless it must also be borne in mind that Alexander is required under the law to minimize his damages by earning what he can."

This Court takes into account the fact that although Mr. Muller should not return to longshoreman work, he is not unemployable, and its award of damages will reflect that consideration.

### Mortality Tables

█ Plaintiff has submitted to the Court the 1960 United States Department of Labor mortality tables which indicate that a normal person of plaintiff's age would have a life expectancy of 27.7 years and a work-life expectancy of 20.6 years. These tables have no relevancy whatsoever to the case at bar. Plaintiff, when examined by Dr. Goldman, was found to have the condition of constitutional obesity. Plaintiff's blood pressure was recorded at 260/140 and noted as "grossly abnormal". Dr. Goldman further found that plaintiff smoked excessively (three packs of cigarettes per day) and maintained an excessive intake of beer and alcohol. In consideration of plaintiff's physical condition and the general state of his health (apart from his knee injury), the Court concludes that the Department of Labor mortality tables are of no assistance, and therefore inapplicable, to a determination of plaintiff's life expectancy or work-life expectancy.

### Damages

Plaintiff was struck in the area of the right knee by the broken cable on November 27, 1968. The blow staggered Mr. Muller, knocking him to his hands and knees, ripping his pants leg, and lacerating his leg in several places. Nevertheless, he was able to climb out of the hold without assistance. He returned to work the following day with a swollen right knee and a slight limp. The longshoremen went on strike soon thereafter, and during the strike plaintiff stayed at his home and rested his knee.

Plaintiff was seen by Dr. Irving Redler on January 10, 1969 complaining of pain and limitation of motion in his right knee region. According to Dr. Redler, plaintiff exhibited symptoms of meralgia paraesthetica, which is an irritation of a nerve running from the pelvic area to the thigh and can be traumatic in origin. Plaintiff showed no limp at that time, no muscle atrophy, and x-rays were negative.

Plaintiff returned to Dr. Redler on May 6, 1969 with a swollen right knee which caused a limp. The doctor found fluid in the knee and a limitation of bending. Believing that cartilage under the kneecap had softened, Dr. Redler, in an attempt to correct this condition, had plaintiff treated by physical therapy, which treatment apparently was unsuccessful. By May 26, 1969 Dr. Redler concluded that plaintiff had chondromalacia of the right kneecap, which condition consists of a roughening of the under surface of the patella. Dr. Redler also noted that plaintiff possibly suffered from a ruptured cartilage in the area of the knee and discussed the possibility of surgery. Dr. Redler performed surgery on July 28, 1969, removed a ruptured semilunar medial cartilage, and confirmed the existence of chondromalacia of the right patella.

Following surgery plaintiff continued to complain of pain in his right knee. On June 30, 1970 Dr. Redler found "synovial thickening" of the knee, believed

708

that the remaining cartilage was degenerating, and concluded that removal of the right kneecap was necessary. Consequently, Dr. Redler performed a surgical removal of the patella on August 18, 1970 and made plastic repairs of tendons and muscles in the vicinity of the right knee for the purpose of strengthening the entire area.

On November 18, 1971 plaintiff, who still was receiving physical therapy, continued to complain that the right leg was weak and tended to give way, and that he needed a walking stick to get around. Dr. Redler noted that a long period of rehabilitation after such surgery is unfortunate, but not uncommon, especially in this case in view of plaintiff's excessive weight. Dr. Redler was optimistic that maximum improvement should be achieved within one or two years. After maximum improvement plaintiff should be able to walk without external support and get along well on level ground. Plaintiff will experience difficulty, however, with stairs, and anything in the nature of jumping, climbing, stooping or running will pose problems for him. The doctor noted that plaintiff should be able to drive a car and, after maximum recovery, should experience little discomfort. Dr. Redler evaluated the plaintiff's present disability at 30% to 35% of the right lower extremity and evaluated residual disability at 20% to 25%.

Dr. H. B. Soboloff examined plaintiff on one occasion shortly before trial. His findings were essentially the same as those of Dr. Redler, and he evaluated plaintiff's disability of the entire leg at 25%. Dr. Soboloff believed, however, that plaintiff has reached his maximum improvement at the time of trial. Finally, Dr. Soboloff was of the opinion that the trauma involved in the striking by the cable of plaintiff's right patella was a causative or aggravative factor relating directly to the plaintiff's chondromalacia.

■ Plaintiff's recovery may include, as damages, recovery for actual wages lost, pain and suffering, impairment of future earning capacity, and medical expenses. See Superior Oil Co. v. Trahan, supra; Martin v. Jones, 296 F.Supp. 878 (E.D.La., 1968); Nylund v. Tip Top Shows, Inc., 289 F.Supp. 1015 (E.D.Wis., 1968); Rehm v. United States, 196 F.Supp. 428 (E.D.N.Y., 1961); Norris, Maritime Personal Injuries, (2d Ed.) § 53, p. 120. Plaintiff has made no claim for medical expenses.[1] As for lost wages and impairment of future earning capacity, the Court is of the opinion that, taking into account plaintiff's physical condition, unrelated to the accident in question, and the other matters considered above, $35,000.00 should provide adequate and fair compensation. Plaintiff obviously has suffered and will continue to suffer pain as the result of his injury, which pain has been aggravated by his failure to follow the directions of his physicians regarding his personal habits and loss of weight. Under all of the attendant circumstances, the Court is of the opinion that $15,000.00 should adequately compensate plaintiff for past and future pain and suffering. Thus, the Court's award to plaintiff is in the amount of $50,000.00, reduced by 50%, the percentage of the plaintiff's contributory negligence.

The Clerk of Court will accordingly issue judgment herein in favor of plaintiff and against defendant in the amount of $25,000.00, together with costs and interest from the date of judicial demand.

1. "The Court has taken into consideration the fact that plaintiff has received Longshoremen's and Harbor Workers' Act benefits and medical benefits from defendant. The Court's award of damages to plaintiff is in addition to these compensation and medical benefits previously received by plaintiff."